Ronald J. OSBORNE, Appellant,

v.

STATE of Indiana, Appellee.

No. 1280S446.

Supreme Court of Indiana.

Sept. 28, 1981.
Rehearing Denied Dec. 9, 1981.

Kevin McShane, Lindsay P. Schneider, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Thomas D. Quigley, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Defendant-appellant Osborne was convicted by a jury in the Adams Circuit Court of kidnapping Claudine Hindenlang and her daughter, Stacey, and of the theft of an automobile belonging to Vickie Wigger. He was sentenced to two fifty year terms for the kidnappings and to a four year sentence for the theft, the three sentences to run concurrently. He raises six issues for our consideration in this appeal, concerning: 1) improper venue; 2) prejudice of defendant by his appearance before some of the jurors in handcuffs; 3) intentional destruction of evidence by the State; 4) prosecutorial misconduct; 5) refusal of the trial judge to grant defendant's oral motion for change of judge; and 6) cumulative impact of all of the above errors.

The evidence revealed that appellant knew Vickie Wigger prior to the incident involved here. On the morning of September 28, 1979, he appeared at her home in Decatur, told her he was in trouble because

of a shooting in Fort Wayne, Indiana, and needed help. He got Wigger to accompany him in her car to Hindenlang's home and then took Wigger, Hindenlang, and Hindenlang's daughter hostage with a .357 Magnum Colt pistol. He told the women he would shoot them if the police attempted to stop them. Appellant also attempted to gain their cooperation by threats of violence. He said he could not use his own vehicle because the police would be looking for it and therefore used Wigger's automobile. Near Anderson, Indiana, he let Wigger and the child out of the car but proceeded on with Hindenlang. He later left her in a cornfield with her hands and feet bound. After he left she was able to free herself and find help in a nearby home.

## I.

Appellant was charged and tried in the Adams Circuit Court on all of the charges. The theft charge, Count III, alleged that the theft was actually committed in Delaware County. Appellant moved to dismiss Count III in the trial court because the Adams Circuit Court did not have jurisdiction over him on that charge. That motion was overruled. A similar situation was resolved by us in *French v. State*, (1977) 266 Ind. 276, 362 N.E.2d 834. In *French* the indictment charged that French had committed murder in Hamilton County but he was, in fact, tried in Henry County after a change of venue from Madison County. We held in that case that the evidence showed that the robbery, abduction, and sexual attacks were all integrally related. One act led to another in what, for purposes of venue, may be considered a single chain of events. Ind.Code § 35–1.1–2–1(d) (Burns Repl.1979) provides: "If the commission of an offense is commenced in one county and is consummated in another county, trial may be had in either of the counties." The facts and circumstances in this case show that the kidnappings and theft were part of one continuous chain of events that were integrally related. Appellant commandeered the auto in Adams County when he pulled out his gun and directed Wigger to drive. Although Wigger had possession, appellant exercised control over the automobile. Appellant was properly charged and tried in Adams County for theft, along with the charges of kidnapping even though it was alleged that the theft took place in Delaware County. The trial court properly overruled the motion to dismiss Count III.

## II.

Appellant next claims he was entitled to a mistrial because he was brought to the court room in handcuffs on the first day of jury selection. It appears some jurors selected to sit on the jury may have observed him in handcuffs that first day. Appellant raised this question during voir dire of the jury and some effort was made to determine from the prospective jurors whether they had seen the defendant in handcuffs and if so, to what extent this prejudiced them in their ability to sit in judgment of the defendant. Counsel for the defendant at one point reminded these people about the presumption of innocence of this defendant and asked those who had formed an opinion of guilt because of the manner in which appellant had been brought into court on that day to raise their hands. None of those prospective veniremen raised their hands at that time. The record shows that all parties were allowed to question the jurors on this subject and several prospective jurors were excused by one party or the other. Appellant did not move to withdraw the submission of the cause from this jury until after the court had read the final instructions to the jury. Counsel stated he wanted to wait until that point of the trial to make a final record because questioning of the prospective jurors would probably have prejudiced them against the defendant. Defendant at this time moved for a mistrial on the grounds that apparently as many as eight of the jurors had seen the defendant brought into court on that first day and at least one or two of them may have seen him in handcuffs. The court overruled the motion at that time. All agree that defendant could have been seen in handcuffs by some of the jurors at the beginning of proceedings, but he did not

again wear handcuffs when he could be seen by the jury at any subsequent time.

Appellant now claims prejudice by the jury must be presumed to such an extent that his conviction should be set aside and he should be granted a new trial. He relies on *Estelle v. Williams*, (1976) 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126. *Estelle* concerned a defendant who had been tried by a jury while wearing identifiable prison clothing during the entire trial. The U. S. Supreme Court held that the constant reminder of the accused's condition, implicit in such distinctive, identifiable attire, may affect jurors' judgment and could therefore be a continuing influence throughout the trial, creating an unacceptable risk by presenting impermissible factors to come into play. The court observed, · "Courts must do the best they can to evaluate the likely effects of a particular procedure, based on reason, principle, and common human experience." *Id.* at 504, 96 S.Ct. at 1693, 48 L.Ed.2d at 130.

■ The situation here can be distinguished from *Estelle* for two reasons. First, the use of handcuffs in transporting a person charged with crime is a security measure the State has a right and a duty to provide. Second, the defendant was not subjected to appearing before the jury throughout the entire trial in handcuffs so that the jury might get an image of him as a dangerous criminal. Here, the court saw to it that the incident was not repeated and, as a matter of fact, the jurors were made aware that it would be improper for them to consider this issue in making their determination of guilt or innocence. Appellant's claim was that at least one or two jurors may have seen that he was handcuffed at the beginning of the proceedings. In *Gregory v. State*, (1980) Ind. 412 N.E.2d 744 we held that the defendant, who had worn jail clothing identifiable as such only by a "J" printed on a trouser leg, and only while he stood during the swearing of the jury, had not been denied his constitutional right to a fair trial. The jury was not continuously exposed to the one portion of his clothing which might have indicated that he was wearing jail garb. It further appears here that appellant did not seek a mistrial in a timely fashion. The question was raised at various times during the trial and the parties all took part in examining the jury about potential prejudice. All the evidence seems to disclose that there was no evidence of prejudice in the jurors. Appellant then waited until the cause was completely submitted to the jury before he moved for a mistrial. Under all the facts and circumstances here, the trial judge was justified in overruling such motion. *Gregory, supra; Bledsoe v. State*, (1980) Ind., 410 N.E.2d 1310.

### III.

Appellant. was arraigned on February 21, 1981, and on that day the trial court *sua sponte* issued its order of discovery. The trial court ordered the State to produce any written or recorded statements and the substance of any oral statements made to the prosecutor, his agent, or a· police officer, by any person having relevant knowledge. It was later stipulated by appellant's counsel that he had been provided discovery on March 18, 1980. That discovery included State's Exhibit IV, a transcribed statement made by witness Wigger to State, County and City police officers on September 29, 1979. The first question on that statement began with this sentence, "Vickie, we know you gave a statement yesterday to Chief Deputy Harold August." It is the text of this first statement allegedly given ". . . [y]esterday to Chief Deputy Harold August," that appellant claims was destroyed by the police to his detriment.

Appellant did not raise the question until July 10, 1980, after the jury had been sworn and Wigger, the State's first witness, had also been sworn and was ready to testify. Appellant's counsel admitted that they had been aware for several months of this state-·ment to Chief Deputy August but they were not aware that the statement had been tape recorded until July 9, 1980. Wigger was not sure she had given any previous statement to August but stated that any and all the statements she gave to the

police at that time were the same and would have recounted the same facts and circumstances. She had no recollection, however, of having given a separate statement to August. By agreement of all parties, Wigger was allowed to testify and appellant cross-examined her before the jury in regard to her statements made to the police. It appears that August had possibly taken a preliminary statement from Wigger on September 28, or 29, 1979, and later found that jurisdiction of the case was with the city police, not the county sheriff's department. The tape was simply re-used and Wigger's statement was not retained by August. It also appears that August may have had Wigger confused with witness Hindenlang. Wigger testified further that when she was at the Sheriff's department they had had trouble with the tape recorder and she wasn't sure that they ever did tape any statement. She said that in the event they had, all of her answers to questions and all statements made by her were the same and that she had never given the police any statement which would in any way be exculpatory as to appellant Osborne.

■ Appellant does not claim there was anything exculpatory about the alleged statement given by Wigger to August if, in fact, it did exist. He merely claims that if he had the statement, it might give him grounds to find inconsistencies in the two statements and impeach Wigger's testimony that did incriminate the appellant. Since there is no showing that any evidence that might be adduced by this statement is material to the defendant's defense or that defendant was thereby prejudiced in any manner by its loss if it did, in fact, exist, then there was no denial of due process to the defendant here. There is no showing that police were purposely attempting to hide or destroy pertinent and material evidence. *Turpin v. State,* (1980) Ind., 400 N.E.2d 1119; *Birkla v. State,* (1975) 263 Ind. 37, 323 N.E.2d 645; *Hale v. State,* (1967) 248 Ind. 630, 230 N.E.2d 432.

IV.

Appellant Osborne called four character witnesses to the stand in his defense. All were officers or employees of the contracting firm for which appellant worked, and all testified generally as to his good working habits and integrity. One of these witnesses was Brian Hensley, who worked for the firm and was also the son of the President of the firm, Herman Hensley, Sr. Brian Hensley testified that appellant Osborne was a good employee and was good with children. He also testified that he would not lie under oath in order to help appellant. He further stated that appellant was his friend and was reliable and honest. It had been stipulated by both parties that when appellant was arrested he had in his possession a Colt .357 Magnum handgun which belonged to Brian Hensley. On cross-examination, Brian Hensley admitted that although he knew defendant had his handgun, he reported it to his insurance company as stolen and filed a claim for recovery of money from the insurance company for the stolen gun. He said he would not have recovered any money for the gun if he had told the insurance company the truth about the gun being in the possession of the police and the court.

The question raised by appellant concerns the conduct of the prosecuting attorney during this questioning. Apparently the prosecutor had some paper in his hand at the time he was asking these questions of Brian Hensley. After these questions were completed, defense counsel moved for a mistrial on the grounds that the State had not provided discovery of the insurance claim made by Hensley that apparently was in the prosecutor's possession during his examination of the witness. The prosecutor's response was that he had no such document and had never had in his possession any claim but had been informed of the claim by the Allen County Prosecutor and had been told about it by a phone call to the office of the insurance company. When he questioned the witness, he had no such document in his possession. Appellant's counsel then responded that it was misconduct for the prosecutor to wave around a piece

of paper giving the impression that he actually had an insurance claim when he questioned the witness about it. The trial court overruled the motion for mistrial, telling appellant's counsel that he had every opportunity to demand to see any document the prosecutor allegedly had in his possession while the witness was still on the stand and testifying. The court further observed that nothing was admitted into evidence in this particular case, the witness had testified, completed his testimony and had been excused by both parties. It is still appellant counsel's belief that the prosecutor had a copy of the claim filed by Hensley. The prosecuting attorney denied there was any such form and offered to allow defense counsel to search his entire file and put every document into evidence if he wished. He stated the only thing he had was a phone message from the insurance company and he would be glad to show that. He said that he just picked up a piece of paper when he was talking to the witness.

Appellant now claims that he was improperly denied a mistrial because the State either failed to disclose impeachment evidence or it engaged in prosecutorial misconduct by tricking the witness. Sanctions for a failure to comply with a discovery order are discretionary, not mandatory. *Richardson v. State,* (1979) Ind., 388 N.E.2d 488, 490; *Rowley v. State,* (1979) Ind., 394 N.E.2d 928, 930; *see Cameron v. State,* (1980) Ind., 412 N.E.2d 1194, 1199. Generally, an order compelling disclosure and a continuance are the appropriate remedies in such a situation. *Richardson v. State, supra; Reid v. State,* (1978) 267 Ind. 555, 565, 372 N.E.2d 1149, 1154–55. Where the violation is grossly misleading or demonstrates bad faith, exclusion of the evidence may be required. *O'Conner v. State,* (1980) Ind., 399 N.E.2d 364, 366. In this case it does not appear that there are grounds from which it could be determined that the State had failed to disclose discoverable evidence. There is not sufficient evidence that a claim form filed by the witness was, in fact, in the prosecutor's possession. Further, it is questionable that a party is required to disclose impeachment evidence under the discovery rules. This is not direct evidence that would be offered by a party other than in response to evidence offered by the opposing party to impeach that testimony and the witness giving it. We see no reason to disturb the trial court's ruling on denying the motion for a mistrial based on the conduct of the prosecuting attorney during this questioning. Direct questions were asked of the witness which were answered directly and apparently truthfully. There is no denial that the testimony brought out an incident that impeached the credibility and integrity of this witness. This is because of the testimony itself and not the manner in which the prosecutor elicited it. It was within the discretion of the trial judge to make an appraisal of the situation and decide whether it required a mistrial. The judge made that determination and gave his reasons which are sound ones. There are no grounds for this court to find reversible error.

### V. & VI.

Appellant contends that the denial of the mistrial motion and the trial judge's apparent approval of the prosecutor's conduct showed such bias and prejudice against the appellant that he was entitled to a change of judge. This motion was denied and the appellant raises the denial of this motion as error, alleging that the judge's action in overruling the motion shows such bias and prejudice that the conviction should be set aside and a new trial granted to appellant.

We find no merit to this contention. We held in issue IV that no prejudicial error was shown by that series of events; therefore, no grounds for change of judge were shown by appellant. Appellant further claims that all the errors he has raised, taken together, amount to fundamental error that justifies the reversal of his convictions and the granting of a new trial. Since we have found that none alone constitutes reversible error, it follows that all of them together do not.

Judgment of the trial court is in all things affirmed.

GIVAN, C. J., and HUNTER, DeBRULER and PRENTICE, JJ., concur.