Edward E. WILLIAMS, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 45S00–9701–PD–45.

Supreme Court of Indiana.

Feb. 23, 2000.

Susan K. Carpenter, Public Defender of Indiana, Danielle L. Gregory, Deputy Public Defender, Ann M. Skinner, Special Assistant, Robert E. Lancaster, Special Assistant, Indianapolis, Indiana, Attorneys for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Rosemary L. Borek, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

SHEPARD, Chief Justice.

Edward Williams filed a petition for post-conviction relief challenging his conviction and death sentence for the murder of three people. The post-conviction court denied the petition and Williams appeals. He presents six issues for our review:

1. Whether the post-conviction court erred in finding he had waived the issue of trial counsel ineffectiveness;

2. Whether Williams was denied effective assistance of trial counsel;

3. Whether Williams was denied effective assistance of counsel on appeal;

4. Whether Williams' death sentence was based on unreliable information;

5. Whether prosecutorial misconduct occurred during the guilt and penalty phases of Williams' trial; and

6. Whether the appointment and assistance of a magistrate during the proceedings was error.

### Facts and Procedural History

The facts as they appear in our opinion from Williams' direct appeal are as follows:

In the early morning hours of June 19, 1992, defendant, armed with a handgun, Jemelle Joshua, armed with a shotgun, and three others set out to steal audio and video equipment from the basement of school teacher Michael Richardson. Defendant and Joshua were admitted to Richardson's home and their three accomplices followed them in. Besides Richardson, they encountered a number of children and adults, including Richardson's sister, Debra Rice, and Robert Hollins. While defendant held his gun to Richardson's head and Joshua held Rice, their accomplices headed for the basement. Hollins intercepted them and began to wrestle with one of them in the kitchen. Defendant responded by shooting Hollins in the back.

The electronic equipment proved too difficult to remove and the defendant ordered the occupants of the house to lie down. Rice attempted to escape and

Joshua shot her in the chest. As the invaders left the home, defendant shot each of Hollins, Rice and Richardson once in the head despite Richardson's plea, "Please don't kill me." A few hours later, defendant would tell his sister that he shot the victims so there wouldn't be any witnesses.

*Williams v. State*, 669 N.E.2d 1372, 1375–76 (Ind.1996), *cert. denied*, 520 U.S. 1232, 117 S.Ct. 1828, 137 L.Ed.2d 1034 (1997).

On July 18, 1992, the State charged Williams with three counts of murder in the perpetration of a robbery and three counts of murder. The State later sought the death penalty on two of the counts. Following trial, the jury found Williams guilty on all counts, but could not agree on a sentencing recommendation. The trial court held a sentencing hearing and imposed a death sentence.

Williams appealed his convictions and sentence, and we affirmed. *See Williams*, 669 N.E.2d at 1390. He later filed a petition for post-conviction relief, which the post-conviction court denied.

### Standard of Review

■ Post-conviction procedures do not afford the defendant with a "super-appeal." Rather, they create a narrow remedy for subsequent collateral challenges to convictions, which must be based on grounds enumerated in the post-conviction rules. Ind. Post–Conviction Rule 1(1); *Weatherford v. State*, 619 N.E.2d 915 (Ind. 1993). The petitioner bears the burden of establishing his grounds for relief by a preponderance of the evidence. P–C.R. 1(5); *Weatherford*, 619 N.E.2d at 917. If an issue was known and available but not raised on direct appeal, it is waived. If it was raised on direct appeal but decided adversely, it is *res judicata*. *Williams v. State*, 706 N.E.2d 149, 153–54 (Ind.1999). When the defendant appeals the negative judgment of a post-conviction court, he must show that the evidence as a whole "leads unerringly and unmistakably to a conclusion opposite to that reached by the trial court." *Id.* at 154 (quoting *Weatherford*, 619 N.E.2d at 917).

## I. Waiver of Ineffective Assistance of Trial Counsel

■ Williams claims that the post-conviction court erred in concluding that he waived the issue of ineffective assistance of trial counsel by failing to raise it on direct appeal. We agree. In *Woods v. State*, 701 N.E.2d 1208 (Ind.1998), *cert. denied*, —— U.S. ——, 120 S.Ct. 150, 145 L.Ed.2d 128 (1999), we held that the claim of ineffective assistance of trial counsel is not waived if not raised on direct appeal, but may be presented in post-conviction proceedings. *Id.* at 1220. Because Williams did not raise the issue of ineffective assistance of trial counsel on direct appeal, we address it. *See id.* at 1222.

## II. Ineffective Assistance of Trial Counsel

■ Williams asserts ineffective assistance of trial counsel on several grounds. To prevail on a claim of ineffective assistance of counsel, Williams must show that his counsel's performance fell below an objective standard of reasonableness as determined by prevailing professional norms, and that the lack of reasonable representation prejudiced him. *Rondon v. State*, 711 N.E.2d 506, 517 (Ind.1999) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).

■ *A. Guilt Phase.* Williams first claims that his trial counsel was ineffective in failing to depose the State's witnesses prior to trial. We initially note that counsel's failure to interview or depose State's witnesses does not, in itself, constitute ineffective assistance of counsel. *Id.* at 519. Williams must identify what additional information would have been discovered and how he was prejudiced by the absence of this information. See *id.*

■ Williams claims that testimony from Jemelle Joshua and Jimichael Parker, if further developed, would have revealed that he was intoxicated during the crime and had used drugs beforehand.

The defense of voluntary intoxication requires a showing that "the intoxication was so severe as to prevent [the defendant] from forming the state of mind necessary to commit [the crime]." *Id.* (quoting *Gambill v. State*, 675 N.E.2d 668, 673 (Ind. 1996)).

According to Jemelle Joshua, during the morning and afternoon of June 18, 1992, he, Williams, and two other people smoked "sherm sticks," or marijuana cigarettes dipped in embalming fluid. (P–C.R. at 2930–32.) The group smoked two "sherm sticks." (P–C.R. at 2939.) Joshua also testified that he and Williams consumed alcohol between 5 p.m. and 7 p.m. that evening. (P–C.R. at 2938.) Jimichael Parker also testified that he witnessed Williams smoking "sherm sticks" and drinking alcohol on the afternoon of June 18th. (P–C.R. at 2247.)

■ Assuming that effective lawyering would have included deposing these two witnesses, it is apparent that they would not have provided evidence demonstrating that Williams was intoxicated at the time the crime occurred or that his alleged intoxication was so severe as to prevent him from forming the requisite intent to rob and murder.

The murders took place in the very early morning of June 19, sometime after 1 a.m. (T.R. at 678, 914.) This was at least six or seven hours after Williams was last seen consuming alcohol or drugs. Moreover, co-conspirator Mark Harris testified that about midnight on the night of the murders, he ran into Williams, Joshua, and Taylor. Williams told Harris that "he had a hit" and that Michael Richardson "had a big screen television" and "numerous V.C.R.s" in his home. (T.R. at 1158.) Williams then asked Harris if he had a gun. Soon thereafter, Williams made a phone call and the group went to Richardson's home, where the robbery and murders took place. On the way to Richard-son's home, Williams gave directions to Lanita Charleston, who drove the group.

Williams' sister Jeanette testified that Williams confessed to her immediately following the murders and discussed the details of the murders with her. (T.R. at 835–42.) Based on the foregoing, even if Williams did consume alcohol and drugs on June 18th, the evidence would not have supported a finding that he was so severely intoxicated as to prevent him from forming the requisite intent.

■ Williams also claims that, had his attorneys spent more time interviewing him, they would have discovered that he had serious "verbal deficits" which would have affected trial strategy; namely, it would have allowed his attorneys to argue that Williams lacked the capacity to be the "ring leader" of the perpetrators. Whatever his lawyers might have been able to argue about Williams' leadership would certainly have been overcome by the fact that he shot all three victims himself. (T.R. at 833–37, 842, 1176–90.) In light of this, whether Williams was the "ring leader" was of little moment.

■ Lastly, Williams argues that his counsel could have impeached State's witnesses Earl Wilson and Jeanette Williams had they had the opportunity to interview them before trial.[1] The record reflects, however, that these witnesses were vigorously cross-examined and impeached on the stand. On cross-examination, Jeanette Williams was questioned about her drug use and about her hospitalization for depression. (T.R. at 852–54.) Likewise, Earl Wilson was asked about his prior criminal history and incidents with the law enforcement officials who questioned him in connection with this case. (T.R. at 1062–63, 1066–67.) Thus, Williams' counsel questioned these witnesses regarding the same facts under which Williams now claims they should have been impeached.

---

1. Specifically, Williams claims that his counsel could have shown that "Jeanette was an incredible witness due to her drug problems" and that Wilson was coerced into testifying by law enforcement officers involved in Williams' case. (Appellant's Br. at 32.)

In light of the foregoing, Williams has not demonstrated how he was prejudiced by his counsels' failure to interview State's witnesses before trial.[2]

■ *B. Penalty Phase.* Williams next maintains that restrictions placed on his attorneys during the penalty phase of trial rendered them ineffective. On direct appeal, Williams argued that the trial court committed reversible error when it restricted the performance of his court-appointed mitigation expert and when it did not appoint a psychologist until a few days before trial. *Williams,* 669 N.E.2d at 1382. We held that no reversible error occurred. *Id.* at 1385–86. In so holding, we concluded that "the defendant did present a substantial mitigation case" at the penalty phase and at sentencing. *Id.* at 1384, 1385. In light of these conclusions on direct appeal, and having concluded that no reversible error occurred, we are unpersuaded by Williams' claim as it fails to meet the prejudice prong of our analysis. While there is always more to be unearthed and argued, the "more" in this instance is not very persuasive.

Williams' trial counsel 1) secured the assistance of a mitigation expert for twenty-five hours and a psychologist who interviewed Williams for 9½—10 hours; 2) presented testimony from the psychologist that Williams had a "low normal" IQ, poor academic skills, and came from a "very chaotic" and "abusive" family background; and 3) presented testimony of Williams' mother and aunt who explained in greater detail the abusive nature of Williams' family. The mitigating evidence presented at post-conviction was essentially the same as that presented at sentencing. Williams fails to establish what additional matters should have been uncovered through additional investigation.[3]

■ Williams also claims that his counsel were ineffective for failing to conduct additional preparation between the penalty phase and the sentencing hearing. The substantial performance of counsel taken as a whole renders unpersuasive that the Sixth Amendment was violated during this period.

## III. Ineffective Assistance of Appellate Counsel

Williams claims: 1) his appellate attorney operated under a conflict of interest, and 2) his appellate attorney was ineffective in failing to raise the issue of insufficient funding of Williams' mitigation specialist on direct appeal.

■ The standard of review for a claim of ineffective assistance of appellate counsel is identical to the standard for trial counsel; thus, we apply the two-pronged *Strickland* test. *Lowery v. State,* 640 N.E.2d 1031, 1048 (Ind.1994), *cert. denied,* 516 U.S. 992, 116 S.Ct. 525, 133 L.Ed.2d 432 (1995).

■ *A. Conflict of Interest.* Williams says his appellate counsel labored under a conflict of interest because he was appointed to represent both Williams and Jemelle Joshua. To prevail on this claim, Williams must demonstrate that his counsel had an actual conflict of interest that adversely affected counsel's performance. *Coleman v. State,* 703 N.E.2d 1022, 1033–34 (Ind.1998), pet. for cert. filed. The mere possibility of a conflict is not sufficient to impugn a criminal conviction. *Id.* Moreover, joint representation is not per

2. Williams also asserts that his counsel was ineffective for failing to call Jemelle Joshua and Che Grafton stating that "they would have spoken to counsel." (Appellant's Br. at 31.) Williams does not describe what additional testimony these witnesses would have given to help his case.

3. Moreover, we determined on direct appeal that "the defendant presented effectively to the jury during the penalty phase *and to the court at sentencing* all those aspects of defendant's background, character or record and those circumstances of the offense that could have been proffered as a reasonable basis for imposing a sentence other than death." *Williams,* 669 N.E.2d at 1385 (emphasis added).

se evidence of ineffective assistance. *Jones v. State,* 536 N.E.2d 267, 272 (Ind. 1989). Rather, Williams must show that his counsel's representation was fully inadequate. *Id.*

■ Williams asserts that the joint representation made for ineffective assistance because his appellate counsel did not focus on Joshua's involvement in the crime. This assertion fails on the prejudice prong. Williams argues that the State sought the death penalty against him because of his level of participation in the crimes. Even assuming this as true, the State presented four aggravating circumstances to support Williams' death sentence and none of these aggravators rested on Williams' role as the alleged "ring leader" of the crimes. See *Williams,* 669 N.E.2d at 1388. Arguments on direct appeal regarding Joshua's involvement, even if such involvement was significant, would not have resulted in a reversal.

Williams has not demonstrated how his defense was adversely affected by his counsel's performance or by his counsel's dual representation. Thus, we cannot find his counsel ineffective on this ground.

*B. Failure to Raise Funding Issue.* Williams also asserts that his appellate counsel was ineffective for failing to cite the trial court's denial of sufficient funds for a mitigation specialist.

■ On direct appeal, Williams' counsel raised a more than adequate argument concerning this issue. Our discussion of this issue included both the temporal and financial limitations placed on the defense in this regard. *Williams,* 669 N.E.2d at 1382–86. Indeed, counsel's argument led this Court to conclude that the trial court had erred in restricting the time available to defense experts, although we determined that such error was not reversible. Williams points to nothing that appellate counsel could or should have done differently to lead to a contrary conclusion. Therefore, we fail to see how Williams was prejudiced by his counsel's failure to raise this issue.

## IV. Sentence Based on Unreliable Information

Williams next claims that his sentence should be reversed because the sentencing judge relied upon information contained in a psychological profile in deciding whether to sentence Williams to death.

As part of the pre-sentencing investigation, Williams completed a psychological questionnaire, as Judge Letsinger requested. The psychological questionnaire contained eighty questions asking for "yes" or "no" responses. (P–C.R. at 2601–03.) The questions were taken from the Minnesota Multiphasic Personality Inventory. Judge Letsinger testified that he routinely asks defendants to complete this questionnaire in order to assist him in determining their sentence, although he cannot recall whether he used the questionnaire in sentencing Williams. (P–C.R. at 2576, 2580, 2591.) Defense counsel received a copy of the completed questionnaire attached to Williams' presentencing report; however, the sentencing order does not refer to the questionnaire. (P–C.R. at 1507–09, 1512.)

■ Williams claims that Letsinger's reliance upon the questionnaire rendered his sentencing decision arbitrary and capricious. (Appellant's Br. at 53.) We have previously considered Judge Letsinger's use of the questionnaire in other capital cases. *Williams,* 706 N.E.2d at 162; *Rouster v. State,* 705 N.E.2d 999, 1015–16 (Ind.1999); *Matheney v. State,* 688 N.E.2d 883, 909 (Ind.1997), *cert. denied,* 525 U.S. 1148, 119 S.Ct. 1046, 143 L.Ed.2d 53 (1999). As in those cases, we review here the aggravating and mitigating circumstances absent the psychological questionnaire to determine whether the death sentence was appropriate. *Rouster,* 705 N.E.2d at 1015.

In sentencing, the court found the following aggravating factors present: 1) Williams intentionally killed Robert Hollins while committing robbery; 2) Williams intentionally killed Debra Rice while committing robbery; 3) Williams intentionally

killed Michael Richardson while committing robbery; and 4) Williams killed two or more persons.[4] (T.R. at 1962–63.) These aggravating factors relate directly to the facts of the crime. There is no indication the trial court could have used the psychological questionnaire in weighing these aggravating factors. *See Rouster*, 705 N.E.2d at 1015.

 The sentencing judge also found that certain mitigating factors existed, but determined that the aggravating circumstances outweighed the mitigating circumstances. (T.R. at 1961, 1963.) On direct appeal, we concluded that the trial court properly imposed the death penalty. *Williams*, 669 N.E.2d at 1390. Re-examining that decision, now, we reach the same conclusion.

## V. Prosecutorial Misconduct

Williams claims that the prosecutor committed misconduct by presenting misleading evidence, withholding material and other exculpatory information, and delaying a request for the death penalty. The State counters that these claims are "doubly waived," first because Williams did not object to the alleged misconduct at trial, and second because Williams knew of the misconduct but failed to raise it on direct appeal. (Appellee's Br. at 35.) We agree that some of the claims are waived; others were unknown and unavailable to Williams at trial and on appeal and thus available on post-conviction.

Williams' specific claims are that the State:

1. presented misleading evidence of:
 a. Williams' sister's drug use on the night she says he confessed to her, and
 b. the victims' criminal history and character;
2. withheld material exculpatory evidence of:
 a. Williams' sister's drug use,
 b. the victims' criminal history and character,
 c. a witness' criminal history,
 d. a jail-house informant's testimony that someone other than Williams boasted about planning and killing one of the victims,
 e. the reward money paid to two informants, and
 f. statements made by Williams and a witness; and
3. delayed charging the death penalty.

 Williams certainly knew at trial and on direct appeal of any alleged delay in the State's decision to pursue the death penalty. That question is thus not available in this collateral proceeding. *See Benefiel v. State*, 716 N.E.2d 906, 911 (Ind. 1999). Williams' other claims assert that the State withheld evidence from or misled him. We therefore examine these claims on the merits.

 In reviewing a claim of prosecutorial misconduct, we "first must determine, with reference to case law and the [Rules of Professional Conduct], whether the prosecutor's actions rose to the level of misconduct. The next consideration is whether the misconduct, under all the circumstances, placed the defendant in a position of grave peril to which he should not have been subjected." *McChristion v. State*, 511 N.E.2d 297, 302 (Ind.1987). The gravity of the peril is determined by its probable persuasive effect on the jury. *Williams v. State*, 715 N.E.2d 843, 847 (Ind.1999).

*A. Williams' Sister's Drug Use.* Williams claims that the State presented misleading evidence about his sister's sobriety at the time he confessed to her and about her hospitalization for depression following that confession.

With regard to Jeanette Williams' sobriety, Williams argues that, while Jeanette

---

**4.** The court noted, however, that no weight would be assigned to this factor against the mitigating factors. (T.R. at 1963.)

testified at trial that she was not using drugs the day Williams confessed, (T.R. at 852, 862, 872–73), her medical records indicate that she was binging on crack cocaine daily around the time of the confession, (P–C.R. at 3304–24). Williams further claims that the State withheld those medical records detailing his sister's crack cocaine addiction. The State counters that there is no evidence to indicate that the State had access to the records. Moreover, the State contends that Jeanette would have released the records to either the prosecution or the defense, had either side sought them. (R. at 3071.)

■ It appears uncontested that the State knew Jeanette was admitted to the Tara Treatment Center shortly after the crime occurred. (Appellant's Br. at 60; *see also* Appellee's Br. at 41.) Williams does not assert, however, that the State discovered the records from the Center. (*See* Appellant's Br. at 60.) As Williams has not shown that the State knew of the records, he has proven no prosecutorial misconduct on the basis that the State withheld them. *See Osborne v. State*, 426 N.E.2d 20, 25 (Ind.1981) ("There is not sufficient evidence that [the document] was, in fact, in the prosecutor's possession."); *Turnbow v. State*, 637 N.E.2d 1329, 1333 (Ind.Ct.App.1994) ("[T]he defendant must show . . . that the prosecutor's actions constituted misconduct by reference to the norms of professional conduct. . . .").

■ Moreover, while Jeanette reported "daily" binging on crack cocaine at the time Williams confessed, (P–C.R. at 3308, 3310, 3323), she also reported periods of abstinence for as long as two days, (P–C.R. at 3323). She testified at trial that she did not use drugs on the day Williams confessed. (T.R. at 879.) The prosecutor did not present misleading evidence regarding Jeanette's use of drugs.

■ Finally, the State did not present misleading evidence about Jeanette's depression. Williams argues that the prosecutor encouraged Jeanette to testify that she was in a hospital for treatment of depression that resulted solely from having to testify against her brother. (Appellant's Br. at 56.) He claims that the "truth of the matter is that Jeanette had a long history of depression due to" a multitude of factors. (*Id.*) In fact, the prosecutor twice asked Jeanette if she was in a psychiatric hospital for treatment of depression that resulted *in part from* testifying against her brother. (T.R. at 850, 878.) She answered yes to both questions. (*Id.*) Again, Williams has proven no misconduct on this basis.

*B. Victims' Criminal Records and Character.* Williams argues that the "prosecutor never disclosed Robert Hollins' criminal history nor the information that Michael Richardson sought sexual relations with teenage boys." (Appellant's Br. at 62.)

■ Generally, evidence of a person's character is inadmissible to prove action in conformity therewith on a particular occasion. *Brooks v. State*, 683 N.E.2d 574 (Ind.1997). An accused is permitted, however, to introduce evidence of a victim's character trait pertinent to the crime. *Id.* (citing Ind. Evidence Rule 404(a)(2)). Michael Richardson's sexual proclivities are hardly relevant to the crime at issue in this case—robbery of electronic equipment and murder of the witnesses. Moreover, Williams himself recognized the inappropriateness of such evidence: "Victim character evidence should not be considered in determining guilt, innocence or appropriate punishment. . . ." (Appellant's Br. at 57–58.) Regardless of whether it was misconduct to keep such information from the defendant, Williams was not subjected to grave peril, because the evidence was inadmissible.

■ Williams' claim that the State committed misconduct by presenting evidence of Richardson's good character is similarly without merit, as the evidence did not subject Williams to grave peril. The State's brief description of Richardson

seems unlikely to have affected the jury's determination of his guilt.

The same holds true for Robert Hollins' criminal history. The State did not commit misconduct by failing to inform Williams that robbery charges were pending against Hollins at the time of his death. (P–C.R. at 3423, 3426–29.) While evidence of Hollins' involvement in the aggressive act of robbery may have been relevant had Williams claimed self-defense, *Brooks*, 683 N.E.2d at 576, the facts show that Williams was motivated by the desire to rob and to kill the witnesses, not by the need to protect himself. Williams has proven no reversible error on this claim.

*C. Witness' Criminal History.* Williams claims the State failed to provide him with a full criminal history of co-conspirator Mark Harris, who testified that Williams shot the victims. He argues that the history would have provided a ground on which Williams could have impeached Harris at trial.

Any misconduct in failing to furnish the defense with Harris' criminal record did not subject Williams to grave peril, as the evidence would have been inadmissible for impeachment purposes. Indiana Evidence Rule 609(a) provides: "evidence that the witness has been convicted of a crime or an attempt of a crime shall be admitted but only if the crime committed or attempted is (1) murder, treason, rape, robbery, kidnapping, burglary, arson, criminal confinement or perjury; or (2) a crime involving dishonesty or false statement." Harris has been convicted of criminal trespass and criminal mischief as class A misdemeanors, crimes not contemplated as admissible under Rule 609(a). As the evidence was inadmissible, it could have no effect on the jury's decision-making process.

*D. The Jail–House Informant.* Williams asserts that the State withheld "information in its files regarding a jail-house informant" who telephoned Detective Branson and told him that he overheard two men, neither of them Williams, discussing planning and killing one of the victims. (Appellant's Br. at 61–62.) Williams argues that the information "could have been used to undermine the State's theory that Williams planned the crime." (Appellant's Br. at 62.)

An inmate who cannot remember who spoke about committing the crime might fairly be recognized as having nothing pertinent to add. The informant's affidavit is remarkably ambiguous.[5] The State presented overwhelming evidence that Williams not only participated in the robbery, but that he shot the victims himself. Neither was his penalty based on the aggravating circumstance that he alone planned the crimes. (*See* T.R. at 1961–62.) In light of the overwhelming evidence of Williams' involvement in the crimes and the fact that neither his guilt nor his penalty rested on the notion that he was the "ring leader," we think that the impact on the jury of the jail-house information would have been slight. Williams was not subjected to grave peril.

*E. The Reward Money.* Williams claims that the State failed to disclose that Detective Branson secured Crime Stopper's reward money for two informants: Earl Wilson, who produced one of the weapons involved, and Runny Gill, the boyfriend of Williams' sister, who convinced Williams' sister to testify at trial. He argues that "[e]vidence of Runny Gill's reward would have cast considerable doubt upon Jeanette Williams' motives for testifying and whether or not she was testifying truthfully. This evidence would also have affected the jury's determination of Earl Wilson's credibility and produced reasonable doubt as to Williams' guilt." (Appellant's Br. at 64.)

5. He averred: "I told [Detective Branson] that [two inmates] were talking about the killing of a Gary school teacher and that one of them was telling the other one that he had heard that he had planned and directed it all and that the another one[sic] was involved...." (P–C.R. at 5121.)

We recently addressed a remarkably similar issue in *Harrison v. State,* 707 N.E.2d 767 (Ind.1999), *pet. for cert. filed.* In *Harrison,* an informant called the arson hotline to give information about a fire. The informant applied for reward money and after trial the detective called the head of the arson hotline to emphasize the importance of the informant's information and subsequent testimony. *Id.* at 789. Harrison argued that, had the jury known about the reward request, the informant's credibility would have been damaged, thereby undermining either the trial court's confidence in the verdict, or the jury's verdict or its recommendation of the death penalty. *Id.*

We said that, to support a claim of prosecutorial misconduct on the basis of withheld evidence, the allegedly withheld evidence must be "material" to the defense. *Id.* Evidence is material only if there is a reasonable probability that the result of the proceeding would have been different, had the evidence been disclosed to the defense. *Id.* (citing *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). A defendant must show that the evidence could have reasonably put the whole case in such a different light as to undermine confidence in the verdict. *Id.* (citing *Kyles v. Whitley,* 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). We held in *Harrison* that, "Neither the application for a reward ... nor the recommendation by the detective is sufficiently probative to satisfy the materiality standard of *Bagley.*" *Id.* Likewise, failure to disclose the informants' rewards in this case did not constitute prosecutorial misconduct sufficient to undermine the integrity of the entire trial.

*F. Pretrial Statements by Witness and Williams.* Williams finally claims that the State failed to turn over to the defense statements made by Lanita Charleston

and by Williams himself. He provides no explanation, through his brief or via affidavits, of how these statements constituted misconduct or placed him in grave peril. At most, he claims, "Disclosure of this information would ... have raised opportunities for the defense to attack the thoroughness and good faith of the evidence." (Appellant's Br. at 65.)[6]

■ As for Williams' statement, Lanita Charleston says that she overheard one side of a telephone call between Williams and a detective. (P–C.R. at 2382–83.) There is no indication that this informal phone conversation was so weighty as to constitute a formal "statement" necessitating disclosure to defense counsel.[7] Williams has not shown prosecutorial misconduct on this basis.

■ Similarly, Williams has provided no evidence that Lanita Charleston's allegedly missing statement existed or, if it existed, that it placed him in grave peril. His citation to the record in support of his claim identifies a colloquy between the prosecutor, defense counsel and the judge in which the existence of the statement and its inclusion in the State's discovery response are contested. (P–C.R. at 1587–88; Appellant's Br. at 64.) If Williams elicited an affidavit from Lanita Charleston about the phone conversation between Williams and a detective, (P–C.R. at 2382), he certainly could have procured an affidavit detailing the contents of the allegedly missing statement. Without such contents and a cogent argument as to their probable persuasive effect on the jury, we conclude that Williams has failed to prove that the omission of the statement in the State's discovery response subjected him to grave peril.

---

**6.** He also claims that the "suppression of these statements was in violation of Williams' constitutional right to due process." (Appellant's Br. at 65.) Because he has provided no cogent argument or citation to relevant authority, he has waived this claim. *See* Ind. Appellate Rule 8.3(A)(7).

**7.** Moreover, an excellent source of information about whatever was said was Williams himself.

## VI. Magistrate's Involvement in Proceedings

After filing his petition for post-conviction relief, Williams moved for change of judge. He requested a judge from outside Lake County and also asked that Magistrate Page be barred from presiding in any part of Williams' post-conviction action. (P–C.R. at 252–58.) Judge Letsinger granted the motion in part, recusing himself and appointing a special judge, but denying the request for a judge outside of Lake County. (P–C.R. at 242.) He overruled the objections to Magistrate Page's involvement.

Williams now contends that Magistrate Page's involvement in his proceedings was in error because 1) the Lake County Magistrate Act is unconstitutional, 2) Magistrate Page was previously involved in Williams' case, 3) Indiana Post–Conviction Rule 1(4) precluded Magistrate Page from conducting an evidentiary hearing, and 4) Magistrate Page's involvement in the post-conviction phase violated Williams' right to due process.

*A. Constitutionality of the Lake County Magistrate.* Williams asserts that the magistrate's involvement in his post-conviction proceedings violated several provisions of the Indiana Constitution.[8] We address each argument in turn.

 *1. Article III, Section 1 and Article VII, Sections 1 and 4.* Williams first contends that the statute adding a magistrate to the Lake Superior court violates Article III, Section 1 [9] and Article VII, Sections 1 [10] and 4 [11] of the Indiana Constitution. We previously rejected similar challenges in *Matheney*, 688 N.E.2d at 894–95. Matheney argued that Ind.Code § 33–5–29.5–7.1, –7.2, which created the magistrate position, violated Article III, Section 1 and Article VII, Sections 1 and 4 of the Indiana Constitution.

We agreed with Matheney that the powers of an appointed magistrate are limited to conducting preliminary proceedings and fact-finding hearings, and that magistrates are not authorized to issue final orders. We concluded, however, that the appointed magistrate there acted appropriately, thus, the act was constitutional as it operated in that case. *Id.* at 895. Therefore, in addressing Williams' claim, we examine whether Magistrate Page acted appropriately as a magistrate.

Here, Page conducted an evidentiary hearing on Williams' petition and assisted the special judge in creating findings of fact and conclusions of law. Magistrate Page did not issue a dispositive order. Rather, Special Judge Maroc denied Williams' petition and both Judge Maroc and Magistrate Page signed the final order.[12] (P–C.R. at 1227.) *See Matheney*, 688 N.E.2d at 895. There is no evidence that Judge Maroc issued this order in an uninformed manner.

8. Williams also challenges the Magistrate Act under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Aside from a one sentence statement that the Act violates these provisions, however, Williams fails to develop this contention. Under Indiana Appellate Rule 8.3(A)(7), failure to provide a cogent argument with adequate citation to authority waives the issue.

9. "The powers of the Government are divided into three separate departments; the Legislative, the Executive including the Administrative, and the Judicial; and no person, charged with official duties under one of these departments, shall exercise any of the functions of another, except as in this Constitution expressly provided." Ind. Const. art. III, § 1.

10. "The judicial power of the State shall be vested in one Supreme Court, one Court of Appeals, Circuit Courts, and such other courts as the General Assembly may establish." Ind. Const. art. VII, § 1.

11. "The Supreme Court shall have no original jurisdiction except in ... supervision of the exercise of jurisdiction by the other courts of the State. ..." Ind. Const. art. VII, § 4.

12. Under Ind.Code § 33–4–7–7, magistrates may not enter a final appealable order unless sitting as a judge pro tempore or a special judge.

Moreover, Judge Maroc retained control over the proceedings, with Magistrate Page's assistance. For example, Judge Maroc continued to sign documents and orders throughout Williams' proceedings. (P–C.R. at 498, 503, 534, 560, 565, 780.) "[T]he magistrate here acted pursuant to Ind.Code §§ 33–4–7–4, –7 & –8, to conduct the preliminary proceedings and the hearing as a gatherer of facts." *Roche v. State,* 690 N.E.2d 1115, 1134–35 (Ind.1997). Because Magistrate Page acted as the statutes contemplate, we conclude that the act was not unconstitutional as it operated in this case.

*2. Article IV, Sections 22 and 23.* Williams also contends that the section providing a magistrate, Ind.Code § 33–5–29.5–7.1, violates Article IV, Sections 22 [13] and 23 [14] of the Indiana Constitution.

Article IV, Section 22 prohibits local or special laws on subjects falling into sixteen categories. Ind. Const. art. IV, § 22. Williams contends that the section adding a magistrate is unconstitutional as a law "[r]egulating the practice in courts of justice." *Id.* We note that, in determining whether a legislative classification is "special," every reasonable presumption must be indulged in favor of the constitutionality of the statute. *Tinder v. Music Operating, Inc.,* 237 Ind. 33, 142 N.E.2d 610 (1957).

Resolution of this issue begins with a determination of whether the act adding a magistrate is a law "[r]egulating the prac-

tice in courts of ·justice." We conclude that it is not.

"Practice" has been defined as "[t]he procedural methods and rules used in a court of law," and a "practice act" has been defined as "[a] statute governing practice and procedure in courts ... usu[ally] supplemented with court rules such as the Federal Rules of Civil Procedure." Black's Law Dictionary 1191 (7th ed.1999). Indiana Code § 33–5–29.5–7.1 does not purport to regulate practice within Lake County courts. Rather, it merely provides that judges of the criminal division may appoint two magistrates to serve this division. Ind.Code Ann. § 33–5–29.5–7.1 (West Supp.1999). For this reason, the statute does not violate Article IV, Section 22. [15]

Williams also claims that the section violates Article IV, Section 23 of our constitution. In analyzing a law under Section 23, we must first determine whether the law is general or special. If the law is general, we must then determine whether it is applied generally throughout the State. If it is special, we must decide whether it is constitutionally permissible. *Indiana Gaming Comm'n v. Moseley,* 643 N.E.2d 296, 299–301 (Ind.1994).

Indiana Code § 33–5–29.5–7.1 is a special law because it provides for the appointment of magistrates only in Lake County courts. Certain special acts, however, are constitutionally permissible. If

**13.** "The General Assembly shall not pass local or special laws ... regulating the practice in courts of justice." Ind. Const. art. IV, § 22.

**14.** "In all the cases enumerated in the preceding section and in all other cases where a general law can be made applicable, all laws shall be general, and of uniform operation throughout the State." Ind. Const. art. IV, § 23.

**15.** Under the Indiana Constitution of 1816, the legislature regularly passed special statutes on a variety of topics, leading to the adoption of Article 4, Sections 22 and 23 of the Indiana Constitution of 1850. *Indiana Gaming Comm'n v. Moseley,* 643 N.E.2d 296,

299 (Ind.1994). Perusal of some special laws and laws governing local practice suggests the nature of the problem that Sections 22 and 23 sought to address. *See, e.g.,* an Act authorizing the Hancock County Circuit Court to empanel a grand jury to hear charges against John Hays, ch. LXXXI, 1835 General and Local Laws of Ind. 174 (1834); an Act authorizing the sale of the real estate of the deceased Joseph Swank, ch. LXXXIV, 1835 General and Local Laws of Ind. (1834); and an Act authorizing Margaret Hurd to file a bill for a divorce in Martin County Circuit Court, and to regulate the proceedings thereon, ch. XC, 1849 Local Laws of Ind. 129 (1850).

the subject matter of an act is not amenable to a general law of uniform operation throughout the State, the act is constitutional under Section 23. *Moseley,* 643 N.E.2d at 301.

Magistrate provisions have been established by our legislature to deal with the rapid growth of litigation and cases in our courts, and to supplement trial court resources. *See* John G. Baker, *The Indiana Trial Court System,* 30 Ind. L.Rev. 233, 248–50 (1997). The Lake Superior Court statute on the appointment of magistrates is not mandatory; rather, judges may appoint magistrates to serve the courts when needed. Ind.Code Ann. § 33–5–29.5–7.1 (West Supp.1999). In previously examining the Lake County magistrate provisions under other articles of the Indiana Constitution, we said that the statute was "reminiscent of the acceptable legislative assistance" provided for in early acts allowing the appointment of commissioners to aid and assist the Supreme Court in performing its duties. *See Matheney,* 688 N.E.2d at 894–95.

The legislature periodically decides where the amount of litigation requires more judicial personnel. For example, the chapter governing the Floyd County Superior Court provides for the appointment of one magistrate to serve the judges of the circuit, superior, and county courts within Floyd County, Ind.Code § 33–5–18.1–15, while the chapter governing Lake County allows the appointment of two magistrates to serve the criminal division and two magistrates to serve the civil division. Ind. Code Ann. § 33–5–29.5–7.1 (West Supp. 1999).[16] Similarly, the 1999 General As-

sembly added three judges to the Lake Superior Court. Ind.Code Ann. § 33–5–29.5–27 (West Supp.1999).

This all seems highly ordinary and constitutional. Larger counties, or those with larger case dockets, have a need for the assistance of judges and magistrates. Where the legislature is persuaded of this need, it usually provides for it.

The legislature has enacted a general statute defining the authority and compensation of magistrates. Ind.Code Ann. § 33–4–7–1 (West 1996). It periodically assesses the need for additional judicial officers, usually acting through the Commission on Courts [17] and examining such measures as the Weighted Caseload Study.[18] This is an appropriate balancing of general laws and special laws. *See State v. Hoovler,* 668 N.E.2d 1229, 1235–36 (Ind.1996). For this reason, we hold that the special law found in Ind.Code § 33–5–29.5–7.1 is constitutional under Article IV, Section 23.

*B. Magistrate Page's Prior Involvement in Williams' Criminal Trial.* Williams next contends that Page's involvement in his post-conviction proceeding was error because Page was previously involved in William's criminal trial and in the sentencing phase of his trial.

■■■ Magistrate Page was involved in some aspects of Williams' trial and in the trial of Williams' co-defendants.[19] Thus, Williams argues, Magistrate Page should have been removed from involvement in the post-conviction phase of Williams' proceedings. We disagree. Magistrate

---

**16.** In contrast, the chapter governing the Harrison Superior Court makes no provision at all for the appointment of magistrates. Ind.Code Ann. § 33–5–19.8–1–11 (West 1996).

**17.** Ind.Code Ann. § 33–1–15–1 (West 1996) (establishing Commission on Courts).

**18.** "The Weighted Caseload Study released by the Indiana Judicial Center in January, 1997 is a useful tool, providing baseline information comparing caseloads by attributing weights to various types of cases and average

judicial time devoted to each activity." Indiana Commission on Courts, *1998 Annual Report* 11 (1998).

**19.** This involvement included: issuing probable cause orders against Williams and his co-defendants, holding Williams' initial hearing, presiding over a pre-trial hearing in Jemelle Joshua's case, and presiding over a plea hearing in Che Grafton's case. We note that each of these acts is within the magistrate's powers in assisting criminal division judges under Ind.Code § 33–4–7–4.

Page's involvement in Williams' criminal trial was minimal and arose out of his duties in assisting Judge Letsinger. The crux of Williams' argument is that, since Magistrate Page's authority was derived from Judge Letsinger and, since Judge Letsinger removed himself from the proceedings, Magistrate Page should have likewise been removed from the proceedings. We rejected an identical claim in *Coleman,* 703 N.E.2d at 1036, and we do so here.

*C. Indiana Post–Conviction Rule 1, section 4.* Williams also argues that Indiana Post–Conviction Rule 1, section 4 precluded a magistrate from presiding over the hearing on his petition for post-conviction relief. Post–Conviction Rule 1, Section 4(g) provides: "If an issue of material fact is raised [in the petition for post-conviction relief], then the court shall hold an evidentiary hearing as soon as reasonably possible." Williams contends that the use of the word "court" in this provision dictates that a judge, not a magistrate, preside over the evidentiary hearing.

Indiana Code § 33–4–7–4(11) provides that a magistrate has the power to "[c]onduct an evidentiary hearing or trial." This power applies to any magistrate appointed by a court expressly authorized by statute to appoint magistrates. Ind.Code Ann. § 33–4–7–1 (West 1996). Magistrates assist judges in matters, but do not "become" judges unless they are specifically sitting as special judges. The presiding judge retains control of the proceedings, although a magistrate may assist. Thus, the statute does not contradict the Post–Conviction Rule. Although the Post–Conviction Rule uses the word "court," we reiterate that Judge Maroc presided over the post-conviction proceedings, with Page's assistance, and signed the final order disposing of Williams' petition. Thus, we conclude that "the court" held the evidentiary hearing, with the assistance of a magistrate, as permitted by rule and statute.

*D. Due Process.* Lastly, Williams contends that, by presiding over the post-conviction hearing, Magistrate Page performed a judicial function, thus violating the due process guarantees of the federal and state constitutions. *See* U.S. Const. Amend. XIV, § 1; Ind. Const. Art. I, § 12. The same claim was raised in *Matheney* and in *Roche* and was decided against those petitioners. *Roche,* 690 N.E.2d at 1134; *Matheney,* 688 N.E.2d at 894–96. As we have previously stated, Magistrate Page conducted the hearing pursuant to Ind.Code §§ 33–4–7–4, –7 & –8. The hearing provided Williams the opportunity to present evidence and to file briefs supporting his petition. (R. at 781–889, 1217–27, 1264–3557.) There was no deprivation of due process or due course of law.

### Conclusion

We affirm the judgment of the post-conviction court.

DICKSON, SULLIVAN, BOEHM, and RUCKER, JJ., concur.