**Gerald W. BIVINS, Appellant (Petitioner below),**

v.

**STATE of Indiana, Appellee (Respondent below).**

No. 06S00–9602–PD–173.

Supreme Court of Indiana.

Sept. 26, 2000.

**1120**

Lorinda Meier Youngcourt, Special Assistant to the Public Defender of Indiana, Evans & Youngcourt, P.C., Indianapolis, IN, Janet S. Dowling, Special Assistant to the Public Defender of Indiana, Albuquerque, NM, Attorneys for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Andrew L. Hedges, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

SULLIVAN, Justice.

Gerald W. Bivins seeks post-conviction relief from his convictions for murder and sentence of death arguing, *inter alia,* that his trial counsel did not adequately investigate and present evidence in mitigation of a death sentence. We affirm the post-conviction court's decision to deny post-conviction relief, including its determination that trial counsel did not render deficient performance in investigating and presenting evidence of mitigating circumstances.

### Discussion

Gerald W. Bivins was convicted of murder, robbery, confinement, auto theft, and theft in connection with the killing of Reverend William Radcliffe and sentenced to death. We earlier affirmed Bivins's direct appeal of these convictions and sentence. *See Bivins v. State,* 642 N.E.2d 928 (Ind. 1994), *cert. denied,* 516 U.S. 1077, 116 S.Ct. 783, 133 L.Ed.2d 734 (1996). As permitted by Indiana Post–Conviction Rule 1, Bivins sought collateral review by filing a petition for post-conviction relief. This petition was heard in the Boone Superior Court and post-conviction relief was denied. Bivins now appeals the denial of post-conviction relief to this court. In this opinion, we will refer to the court in which Bivins was originally tried and convicted as the "trial court" and the court in which the petition for post-conviction relief was heard and denied as the "post-conviction court."[1]

---

1. The record of proceedings in the trial court will be identified in this opinion as "T.R." and

Applicable law dictates that we review Bivins's appeal according to certain established standards.

■ First, Indiana Post–Conviction Rule 1(6) requires a post-conviction court to make findings of fact and conclusions of law. When a court makes special findings of fact and conclusions of law, the findings must be supported by the evidence and the conclusions supported by the findings. *See Estate of Reasor v. Putnam County*, 635 N.E.2d 153, 158 (Ind.1994), *reh'g denied.*

■ Second, because Bivins had the burden of establishing his grounds for relief at the post-conviction hearing, Indiana Post–Conviction Rule 1(5), he is now appealing from a negative judgment. And because he is appealing from a negative judgment, we require him to demonstrate that the evidence as a whole was such that it leads unerringly and unmistakably to a decision opposite that reached by the post-conviction court. *See Spranger v. State*, 650 N.E.2d 1117, 1119–20 (Ind.1995), *reh'g denied.* " '[I]t is only where the evidence is without conflict and leads to but one conclusion, and the trial court has reached the opposite conclusion, that' " its findings or conclusions will be disturbed as being contrary to law. *Spranger*, 650 N.E.2d at 1120 (quoting *Fleenor v. State*, 622 N.E.2d 140, 142 (Ind.1993), *cert. denied*, 513 U.S. 999, 115 S.Ct. 507, 130 L.Ed.2d 415 (1994)).

■ Third, several of Bivins's claims for post-conviction relief are grounded in his contention that he did not receive the minimum level of effective assistance from his trial counsel that the Constitution requires. We analyze such claims according to the two-part test announced in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See, e.g., Lowery v. State*, 640 N.E.2d 1031, 1041 (Ind.1994), *cert. denied*, 516 U.S. 992,

116 S.Ct. 525, 133 L.Ed.2d 432 (1995). We require the defendant or petitioner to show that, in light of all the circumstances, the identified acts or omissions of counsel were outside the wide range of professionally competent assistance. *Id.* This showing is made by demonstrating that counsel's performance was unreasonable under prevailing professional norms. *Id.* (citing *Turner v. State*, 580 N.E.2d 665, 668 (Ind. 1991), *reh'g denied*). And we require the defendant or petitioner to show adverse prejudice as a result of the deficient performance. This showing is made by demonstrating that counsel's performance was so prejudicial that it deprived the petitioner of a fair trial. *Williams v. Taylor*, 529 U.S. 362, ——, 120 S.Ct. 1495, 1511, 146 L.Ed.2d 389 (2000) (quoting *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052); *Lowery*, 640 N.E.2d at 1041. To establish prejudice, the defendant or petitioner " 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome.' " *Williams*, 529 U.S. at —— – ——, 120 S.Ct. at 1511–12 (quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052).

## I

■ Bivins contends that he is entitled to post-conviction relief because his trial counsel failed "to investigate, understand, present, and argue" evidence in mitigation of the death sentence. Br. of Appellant at 45. Under the Indiana death penalty sentencing scheme, in order for a jury to recommend and for a trial court to impose a sentence of death, each must find that any circumstances that exist in mitigation of the death sentence are outweighed by specified circumstances in aggravation. *See* Ind.Code § 35–50–2–9(e) (Supp.1990).[2]

---

the record of proceedings in the post-conviction court as "R."

**2.** Unless otherwise indicated, references in this opinion to the Indiana death penalty stat-

ute, Ind.Code § 35–50–2–9, are the version published in the 1990 Supplement to the Indiana Code. This was the version in effect on the date of Bivins's crimes.

Bivins argues that his trial counsel conducted insufficient investigation as to the existence of mitigating circumstances and provided him with ineffective representation during the death penalty phase. In particular, Bivins contends that an adequate investigation would have revealed that Bivins was a victim of a parental neglect, of alcoholism, of Attention Deficit Hyperactivity Disorder (ADHD), of a central auditory processing disorder, and a speech defect (stuttering).

As required by Indiana Post–Conviction Rule 1(6), the post-conviction court made specific findings of fact and conclusions of law. From its findings, it concluded as a matter of law that trial counsel did investigate and attempt to present mitigating evidence and that none of the mitigating evidence presented to the post-conviction court would likely have changed the sentencing decision of the jury or trial court.

## A

Bivins's counsel lodges several challenges against the post-conviction court's findings of fact as not being supported by the evidence. *See Estate of Reasor*, 635 N.E.2d at 158 (ruling that when a court makes special findings of fact and conclusions of law, the findings must be supported by the evidence).

■■■ As pointed out recently in *State v. Holmes*, 728 N.E.2d 164, 168–69 (Ind. 2000), *reh'g denied*, this Court will accept the post-conviction court's findings of fact so long as they are not "clearly erroneous." *See also* Ind. Trial Rule 52(A). We examine only the probative evidence and reasonable inferences that support the post-conviction court's determination and we neither reweigh the evidence nor judge the credibility of witnesses. *Holmes*, 728 N.E.2d at 169; *Spranger*, 650 N.E.2d at 1119. "Clear error" is that " 'which leaves us with a definite and firm conviction that a mistake has been made.' " *State v. Van Cleave*, 674 N.E.2d 1293, 1295–96 (Ind. 1996) (quoting *Spranger*, 650 N.E.2d at 1119), *reh'g granted in part*, 681 N.E.2d

181 (1997), *cert. denied*, 522 U.S. 1119, 118 S.Ct. 1060, 140 L.Ed.2d 121 (1998). We begin by examining each challenge to the post-conviction court's findings of fact to determine if the findings are clearly erroneous.

■■■ 1. In the last sentence of finding of fact no. 46, the post-conviction court found that Bivins's relatives testified that his "parents sometimes got along well with each other but argued at other times." Bivins argues that only one relative made that observation and several relatives testified to a much more turbulent relationship. Bivins contends that the post-conviction court's finding minimizes the violent nature of his parents' relationship, completely ignores that Bivins was a witness to this violence, and is not supported by the weight of the evidence.

Our review of the record indicates that Bivins presented testimony or affidavits at the post-conviction hearing from thirteen eyewitnesses of his childhood in Evansville, including his mother and brother. Four of those childhood-era witnesses testified that Bivins's parents did not get along well and fought with each other. One of those witnesses also testified that at other times, Bivins's parents got along well. Another of those witnesses testified that Bivins's parents "ran around" on each other (R. at 1176–77, 1181) and that Bivins "had to see" the fights between his parents. (R. at 1180.) The nine other witnesses (including Bivins's mother and brother) made no mention of violence between Bivins's parents in their testimony or affidavits.

The post-conviction court might have included a finding concerning violence in Bivins's childhood home. However, a large majority of the childhood-era witnesses (including his mother and brother) made no mention of it and there was no conclusive evidence of the extent of his awareness of whatever violence was present. The evidence supports the findings made by the post-conviction court.

■ 2. Bivins argues that the post-conviction court's statement in finding of fact no. 46, that he was raised in "a lower-middle class neighborhood," is not supported by the record. Rather, he argues it was an extremely poor and dangerous neighborhood. In making this finding, Bivins contends that the post-conviction court focused on one sentence from one witness and ignored all evidence to the contrary.

Our review of the record indicates that four of the thirteen childhood-era witnesses, including Bivins's brother, described the neighborhood in which he grew up in the following ways: "Not the nicest neighborhood"; (R. at 1083); "lower-middle class"; (R. at 1092); a "rough neighborhood" where some of the adults were drug dealers, thieves and alcoholics; (id.); a neighborhood where "kids that would get into trouble" lived; (R. at 1102); "lower class"; (R. at 1103); a neighborhood "where you had to be able to protect yourself"; (R. at 1141); not "the high class neighborhood"; (id.); "pretty rough"; (id.); "[i]f you were out at night you needed somebody with you"; (id.); "the poor side of town"; (R. at 1166).

While each of these characterizations suggests a somewhat less attractive environment than the post-conviction court's "lower-middle class neighborhood," reasonable inferences from this evidence support the findings made by the post-conviction court. Each of the four witnesses' characterizations were brief and quite subjective; none detailed the reasons for his or her descriptions. None of the other childhood-era witnesses commented on the quality of the neighborhood. No empirical evidence of poverty, crime rates, or other socio-economic indicators was presented. And there was evidence that Bivins had good friends in the neighborhood while growing up, including at least one neighbor family with whom he would start each school day and that tried to provide him with a nurturing environment.

■ 3. Bivins takes issue with the post-conviction court's statement in finding of fact no. 47 that, despite being raised in the same environment, Bivins's brother had "no convictions for robbery or murder." (R. at 566.) Bivins contends that while it is true that his brother "has never been convicted of robbery or murder, the court's finding is misleading because it tells only half the story." Br. of Appellant at 51. He maintains that his brother's life had indeed been troubled, including difficulties with the law.

Bivins's claim here is not that the trial court's finding was wrong but that it was incomplete. While the trial court was accurate in finding that Bivins's brother has "no convictions for robbery or murder," that finding is not particularly helpful in evaluating whether trial counsel was ineffective in its mitigation presentation and we disregard it for that purpose.

■ 4. Bivins contends that the post-conviction court's statement in finding of fact no. 48 that his grandfather had an affectionate relationship with him was also only partly true. Bivins argues that all witnesses who testified about his grandfather described him to be a dangerous alcoholic. We do not believe that the post-conviction court's finding is at odds with Bivins's argument on this point: "His grandfather had a drinking problem and was described as a disciplinarian." (R. at 566.)

■ 5. Bivins contends that the post-conviction court's statement in finding of fact no. 49 that Lois Chevalier, the mother of a childhood friend of Bivins, did not believe he was being mistreated at home ignored the remainder of her testimony and that of other witnesses that Bivins's physical and emotional needs went unattended. Bivins's principal point here is that neglect of a child's physical and emotional needs constitutes mistreatment as much as physical abuse.

We read the post-conviction court's finding to mean that Bivins's was not subject-

ed to physical abuse at home. Bivins does not contend to the contrary and reasonable inferences from the evidence support the post-conviction court's finding that no physical abuse occurred. The post-conviction court did acknowledge that Bivins endured parental neglect. The post-conviction court determined that Bivins's father "was not an affectionate man," and "did not spend much time at family gatherings, and spent much time out of town." (R. at 565.) At the same time, we agree that there was substantial evidence of probative value that many of Bivins's physical and emotional needs as a child were neglected. It would have been appropriate for the post-conviction court to have made more extensive findings on this point.

6. Bivins acknowledges the accuracy of the post-conviction court's statement in finding of fact no. 51 that his childhood was marked with discipline problems. He contends that it ignores the evidence regarding the cause of these problems – his need for acceptance and friendship, especially in the face of constant ridicule and social isolation because of his stuttering. However, the post-conviction court did recognize that Bivins "had a stuttering problem which embarrassed him and lead others to sometimes tease him." (R. at 567.) While the post-conviction court did not discuss the specific cause of the discipline problems, reasonable inferences could be drawn from the evidence that the discipline problems resulted from stuttering and the teasing from others.

 7. Bivins takes issue with the post-conviction court's finding of fact no. 52 and the factual statement in conclusion of law no. 97 that his stuttering was not severe. He summarizes the testimony of ten witnesses at the post-conviction hearing which he contends demonstrates the severity of his stuttering and the ridicule that it provoked. The State responds, without citation to the record, as follows: "[I]t bears emphasis that most of the evidence presented to the post-conviction court suggested that Bivins's stuttering

problem was not severe." Br. of Appellee at 17.

In fact, eight of the thirteen childhood witnesses testified that Bivins had a stuttering problem. Almost all of those eight also testified that Bivins had a speech articulation problem in addition to stuttering and that he was mocked by family members and other children for these difficulties. Three of these eight witnesses testified that they were able to understand Bivins when he spoke though others were not. At the post-conviction hearing, Bivins's mother testified that although speech therapy was of some help with articulation, it did not help his stuttering. Bivins's brother testified that the stuttering problem improved over time. School records introduced by Bivins show that he received speech therapy and made fair progress. The two expert witnesses who testified for Bivins at the post-conviction hearing, Dr. Susan Arnold and Dr. Patricia Chunn, stated that their investigations found that he suffered from stuttering and speech problems as a child. Dr. Chunn testified that Bivins's mother told her that there were many times during his childhood that he stuttered so badly he could not be understood, and that he was often teased. Dr. Chunn also testified that Bivins's speech teacher did not do well with him.

The post-conviction court's findings on stuttering read as follows: "He had a stuttering problem which embarrassed him and lead others to sometimes tease him. However, school records from 1965–1972 showed that he received speech therapy and made progress on the problem. Richard Bivins also noticed that the stuttering problem improved over time." (R. at 567.) "The problem was not severe." (R. at 596.) While the post-conviction court might properly have said more about Bivins's stuttering, we have reviewed the evidence and find that it does support the findings made by the post-conviction court.

8. Bivins also disputes the post-conviction court's factual statement in conclusion

of law no. 97 that speech pathologist Patricia Chunn's opinions as to Bivins's auditory processing deficit and speech defect were based on research and information "not necessarily available" at the time of trial. (R. at 596.) It appears to us that most of the research and information concerning stuttering and speech disorders generally upon which Dr. Chunn's opinions were based were, contrary to the post-conviction court's finding, available at the time of trial. At the same time, however, we believe the post-conviction court's finding in this regard is based on Dr. Chunn's testimony that there had been new developments in research in her field, that she had kept current on that information, and that her opinion had been affected by her ongoing reading and training.

9. Dr. Susan Arnold conducted an extensive neuropsychological evaluation of Bivins and testified at the post-conviction hearing that he suffers from attention deficit hyperactivity disorder (ADHD). Bivins contests the post-conviction court's statement in finding of fact no. 57 and factual statement in conclusion of law no. 97. He contends the post-conviction court questioned her testimony both on grounds that it may have been based on Bivins "lying and misrepresenting things" and based, in part, on knowledge about ADHD that has developed since Bivins's trial. Bivins points to Dr. Arnold's testimony that she protected against the possibility of his intentionally skewing the results by giving a large number of tests, insuring that Bivins would be unable to tell exactly what she was testing for. He also emphasizes that her diagnosis of ADHD has extensive support in the testimony of at least eight other witnesses. And he notes that ADHD was discovered in 1937 and was clearly a well-known impulse control disorder at the time of trial.

We do not quarrel with Bivins's analysis on either of these points. But we find nothing in the post-conviction court's findings to indicate that it concluded that Bivins successfully skewed Arnold's test results. Furthermore, although the post-conviction court could have reiterated the testimony of other witnesses about Bivins's disorder, the post-conviction court adequately recognized that Dr. Arnold concluded that Bivins suffered from ADHD and that the diagnosis of this disorder was not tainted by lying on the part of Bivins. In reaching this conclusion, we read the post-conviction court's finding to mean that despite Bivins's "history of lying and misrepresenting things," Dr. Arnold "nonetheless" decisively "concluded that Bivins has 'attention deficit hyperactivity disorder.'" As such, the findings made by the post-conviction court are sufficiently supported by the evidence.

10. Bivins takes issue with the post-conviction court's finding of fact no. 29 and the factual statement in conclusion of law no. 95 that trial counsel Gross "recalled talking with family members by phone as part of the preparation for the penalty phase" and that Gross believed Charles Keenan, a private investigator, "talked to people in Evansville concerning mitigation." Bivins says that Gross's itemized billing records show that he only talked to Bivins's brother and only during trial (not before it). Bivins also characterizes Keenan's post-conviction affidavit as standing for the proposition that "Keenan believed he had no responsibility for developing penalty phase evidence." Br. of Appellant at 49. We find the trial court accurately characterized Gross's testimony and that Keenan's affidavit could easily be read to support Gross's description of Keenan's work. Keenan said he was "not responsible for the investigative responsibilities in the mitigation phase of the case, though [he] did interview some family." (R. at 1037.) Reasonable inferences from this evidence support the findings made by the post-conviction court.

Because the post-conviction court's findings are supported by the evidence, they are not clearly erroneous, and therefore will not be set aside.

## B

■ Bivins also challenges the post-conviction court's conclusions of law in several discrete respects. Although the reviewing court accepts the post-conviction court's findings of fact unless "clearly erroneous," it does not grant deference to the post-conviction court's conclusions of law. *Holmes,* 728 N.E.2d at 169.

■ 1. Bivins disputes the post-conviction court's statement in conclusion of law no. 95 that while there may be mitigating information in Bivins's school, health and service records, any mitigating effect is offset by discussions of his past delinquency, criminal conduct, and unsuccessful attempts to help him in the past and by the absence of any diagnosis of substantial mental illness. Bivins responds that he was not seeking to have those records introduced into evidence but only to provide source material for a reasonable investigation into his mental and emotional health. We have difficulty with the logic of this argument. Bivins seems to contend that these records should have been consulted by trial counsel but not used as evidence of mitigation (because of the offsetting negative information they contend). If that is a claim, it is hard to see how counsel could be found ineffective for failing to consult records that Bivins acknowledges would have disadvantaged his mitigation case. Of course, it might be that those records would have provided leads to other mitigating circumstances but, in the absence of identifying any such circumstances without offsetting negative evidence, no claim of ineffective assistance of counsel is made out.

■ 2. In its conclusion of law no. 86, the post-conviction court held that any weight to be given the mitigating effect of ADHD in this case was "negligible" because there was no causal connection between ADHD and Bivins's crime. (R. at 588–89.) The State reiterates this point in its brief. But we agree with Bivins that a circumstance need have no particular causal connection to the crime in order to be entitled to mitigating effect under the Constitution or the Indiana death penalty statute. *See Lockett v. Ohio,* 438 U.S. 586, 605, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (holding that the Constitution requires that the sentencer in a capital case must be able to give independent mitigating weight to any aspects of the defendant's character and record which may call for a less severe penalty); Ind.Code § 35–50–2–9(c)(8) (1990) (The judge and jury in a capital case may consider, in addition to seven itemized mitigating circumstances, "[a]ny other [mitigating] circumstances appropriate for consideration."). At the same time, the extent to which there is a causal connection may well affect the weight it is given.

■ 3. Bivins argues that the post-conviction court conclusion of law no. 100 is incorrect in holding that trial counsel was not ineffective for tendering a jury instruction to the effect that jurors should look to their "own background, experiences, beliefs and convictions as well as [their] feelings concerning the death penalty in deciding whether or not to recommend such a sentence in this case."[3] Br. of Appellant at 61. First, Bivins contends that this instruction conflicts with another jury instruction that informs the jury that it could only consider the charged aggravating circumstances. We find no inconsistency; one's background, experiences, beliefs, and convictions do not constitute aggravating circumstances. Second, Bivins contends that because "death-quali-

---

3. Twice previously defendants in capital cases claimed on appeal that their trial courts erroneously refused to give the instruction that Bivins claims was erroneously tendered and given in his case. *See Canaan v. State,* 541 N.E.2d 894, 911 (Ind.1989) (holding no abuse of discretion in trial court's refusal to give the instruction), *cert. denied,* 498 U.S. 882, 111 S.Ct. 230, 112 L.Ed.2d 185 (1990); *Fleenor v. State,* 514 N.E.2d 80, 86 (Ind.1987) (holding another instruction conveyed the same basic message), *cert. denied,* 488 U.S. 872, 109 S.Ct. 189, 102 L.Ed.2d 158 (1988).

fied jurors are, by definition, in favor of the death penalty and more than willing to impose it," an instruction advising jurors to look to their own feelings concerning the death penalty was to Bivins's detriment. *Id.* at 62. We reject the premise that jurors in capital cases are "more than willing" to recommend a death sentence and agree with the post-conviction court that this instruction could only have benefited Bivins.[4] As such, counsel was not ineffective for tendering it.

### C

We now turn to the post-conviction court's conclusion that trial counsel discharged their constitutional duty to investigate and present mitigation. Bivins vigorously disputes the conclusion, pointing to the failure to solicit health, education, and military records or to consult with members of Bivins's extended family. Br. of Appellant at 60–61. And he argues that the additional personal, family, and social history testimony that would have been available through other witnesses would have clearly placed him in a more sympathetic light and should have been presented and considered to the jury. *Id.*

Trial counsel's efforts in this regard were described by the post-conviction court as follows:

28. [Trial counsel] Gross considered the penalty phase difficult. To him, Bivins seemed "well adjusted," and nothing "jumped out" as an explanation for the killing. Gross explained the strategy to portray the crime as a random, unfortunate, isolated act and to show that Bivins was not as bad as he was being portrayed. As it was part of the defense strategy to have Bivins express remorse, counsel believed that the jury needed to hear from him and view him as a human being.

29. Counsel hired Charles Keenan, an investigator, who investigated Bivins'[s] accomplices and, Gross believes, talked to people in Evansville concern-ing mitigation. Keenan was paid for his services. Gross recalled talking with family members by phone as part of preparation for the penalty phase.

30. Richard Bivins, Bivins'[s] brother and a veteran honorably discharged from the Air Force, testified about family history, Bivins'[s] problem with "drinking and doing drugs" and Bivins'[s] prior imprisonment. He also testified about how Bivins tried to counsel a niece to do well in school and avoid drugs ([T.]R. at 3876–81). Bivins'[s] mother, Marilyn G. Bivins, testified about his school history, his drug and alcohol abuse and rebelliousness as a youth, and the history of alcoholism in the family, including Bivins'[s] alcoholic grandfather. She also testified about how much she loves her son ([T.]R at 3884–91). Bivins'[s] wife, Patricia Bivins, also testified ([T.]R. at 3894–3896). Thomas Ulrey, Bivins'[s] former employer, testified that Bivins had the potential to succeed with training as an industrial painter but that he dismissed Bivins for poor attendance caused by his drinking problem ([T.]R. at 3897–3902). Bivins testified on his own behalf and apologized, saying that he was sorry for killing Mr. Radcliffe ([T.]R. at 3903).

(R. at 558–59.)

As suggested by the discussion in part I–A, there was extensive testimony at the post-conviction hearing concerning Bivins's personal, family, and social history. This testimony included information on his relationship with his mother, father, and grandfather; his relationship with his brother, playmates, and neighbors; the neighborhood in which he grew up; his academic, health, and military records; and his hyperactivity, discipline problems, and stuttering. The post-conviction testimony also included the reports of a psychologist and speech therapist who examined Bivins at the request of post-conviction counsel.

---

4. We suggested as much in our opinion on direct appeal. *Bivins,* 642 N.E.2d at 946 n. 6.

After making findings of fact (many of which are discussed in part I–A *supra*), the post-conviction court concluded in part:

95. Counsel was not ineffective at the penalty phase for failing to investigate and present more evidence in mitigation. Counsel competently presented the testimony of Bivins, his relatives and former employer who collectively presented to the jury evidence about Bivins'[s] personal and family history, the family's history of alcoholism, his own problem with alcohol and drugs, his rebelliousness as a teenager and his potential to succeed with training as an industrial painter. Counsel cannot be branded as ineffective for not presenting more of the same type of personal, family and social history through other witnesses. Though there may be portions of Bivins'[s] school, health and service records that a defense attorney might attempt to characterize as mitigation, any mitigating effect of those portions is counteracted by the records highly unflattering descriptions of delinquency, criminal conduct and unsuccessful attempts to help him in the past, and the notable absence from those records of any diagnosis of substantial mental illness.

96. Much of Bivins'[s] personal history detailed in the post-conviction hearing relates to his childhood. The absence of such a detailed depiction of his childhood at the trial does not constitute ineffective assistance because neither the jury nor the judge are required to find a defendant's troubled childhood to be a mitigating factor. *Lowery v. State,* 547 N.E.2d 1046, 1059 (Ind.1989) [*,cert. denied,* 498 U.S. 881, 111 S.Ct. 217, 112 L.Ed.2d 176(1990).] After all, Bivins was an adult when he intentionally murdered Mr. Radcliffe.

97. Counsel did not perform incompetently by failing to present Bivins'[s] history of stuttering as a mitigating factor. The problem was not severe. In any event, jurors heard him testify and

heard recordings of his statement to police and could draw their own conclusions about the extent of his stuttering problem. Neither the jury nor the judge are required to find certain factors to be mitigating factors simply because there is some evidence in the record to support them. *Bivins,* 642 N.E.2d at 952. Stuttering does not mitigate his intentional killing of Mr. Radcliffe while robbing him. Speech pathologist Chunn's opinion that Bivins suffers from a central auditory processing disorder does not indicate ineffective assistance either. Like the opinion of Dr. Arnold, Chunn's opinion is admittedly affected by ongoing research and information not necessarily available in 1991–92. Further, she admitted she found Bivins to be very bright, confessed knowing very little about Bivins'[s] crimes and had no opinion concerning how his disorder would affect his crimes. This is hardly the type of mitigation evidence that would support condemning counsel as ineffective.

(R. at 595–96.) We have already reviewed in detail many of the principal factual statements embodied in these three paragraphs and determined that the findings were not clearly erroneous. *See* part I–A, *supra.* We now analyze whether those findings support the post-conviction court's conclusion that trial counsel discharged their constitutional duty to investigate and present mitigation.

Death sentences are frequently challenged on the basis that trial counsel failed to investigate or present evidence of mitigating circumstances. *See Rondon v. State,* 711 N.E.2d 506, 520–21 (Ind.1999). In a small number of cases, where the failure to investigate or present mitigating circumstances was accompanied by a failure to present much of a defense at the penalty phase at all, we have granted relief. *Id.* at 521; *Averhart v. State,* 614 N.E.2d 924, 930 (Ind.1993), *reh'g denied*; *Burris v. State,* 558 N.E.2d 1067, 1074 (Ind.1990), *cert. denied,* 516 U.S. 922, 116

S.Ct. 319, 133 L.Ed.2d 221 (1995); *Smith v. State*, 547 N.E.2d 817, 822 (Ind.1989). But we have also affirmed capital sentences in the face of claims that trial counsel investigated or presented little in the way of mitigation where trial counsel did pursue a penalty phase strategy of consequence, or where there was little mitigating evidence available or what there was could have been viewed negatively by the jury. *See, e.g., Brown v. State*, 698 N.E.2d 1132, 1140 (Ind.1998), *cert. denied*, 526 U.S. 1056, 119 S.Ct. 1367, 143 L.Ed.2d 527 (1999); *Timberlake v. State*, 690 N.E.2d 243, 261 (Ind.1997), *cert. denied*, 525 U.S. 1073, 119 S.Ct. 808, 142 L.Ed.2d 668 (1999); *Canaan v. State*, 683 N.E.2d 227, 234 (Ind.1997), *cert. denied*, 524 U.S. 906, 118 S.Ct. 2064, 141 L.Ed.2d 141 (1998). The United States Supreme Court and the Seventh Circuit have done so as well. *See, e.g., Darden v. Wainwright*, 477 U.S. 168, 186, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); *Stewart v. Gramley*, 74 F.3d 132, 135–37 (7th Cir.), *cert. denied*, 519 U.S. 838, 117 S.Ct. 113, 136 L.Ed.2d 65 (1996).

The more difficult claims to resolve are those where trial counsel put on a mitigation case but the post-conviction investigation demonstrates that there was more that could have been discovered and presented. That is the nature of Bivin's claim.

It was also the nature of the claim in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), a Virginia capital case in which the United States Supreme Court vacated Williams's death sentence on grounds of ineffective assistance of counsel. *Williams* was decided after this case was taken under submission and neither the State nor Bivins have claimed *Williams* as additional authority under Indiana Appellate Rule 8.4(B). We observe that the claim on which Williams prevailed was essentially that which Bivins makes here: that trial counsel's deficient performance in investigating and presenting mitigating circumstances caused prejudice within the meaning of *Strickland*.

Notwithstanding *Williams*, we find that Bivins is not entitled to relief.

Bivins's trial counsel had a reasonable penalty phase strategy and executed it. That strategy was to portray Bivins's "crime as a random, unfortunate, isolated act" in an effort to "show that Bivins was not as bad as he was being portrayed." (R. at 558, 1661, 1794–95.) That strategy included putting Bivins on the stand to testify to his remorse.

Williams's counsel's performance was quite different. To the extent that counsel had any penalty phase strategy at all, it appears to have been to focus on Williams's voluntary confession. *Williams*, 529 U.S. at ——, 120 S.Ct. at 1514. But if that was the initial strategy, it had been abandoned by closing argument which was instead "devoted to explaining that it was difficult to find a reason why the jury should spare Williams's life." *Id.* at ——, 120 S.Ct. at 1500. Justice O'Connor described this speech as a "generic, unapologetic closing argument, which provided the jury with no reasons to spare [Williams]'s life." *Id.* at ——, 120 S.Ct. at 1525.

A second part of Bivins's counsel's penalty phase strategy was to present the jury and the trial court with what we find to have been at least the principal contours of Bivins's background, character, and record. *See Roche v. State*, 690 N.E.2d 1115, 1126 (Ind.1997), *reh'g denied*. The jury and trial court heard from Bivin's brother about Bivins's problem with "drinking and doing drugs" and Bivins's prior imprisonment. (T.R. at 3878, 3883.) They heard Bivins's mother testify about his school history, his drug and alcohol abuse and rebelliousness as a youth, and the history of alcoholism in the family, including his alcoholic grandfather. (T.R. at 3885–88.) The post-conviction proceeding showed that there was more in the way of mitigating circumstances that could have been discovered. But we are hard pressed to fault counsel, given the overall pressures of a capital trial timetable and the fact that

counsel had a coherent penalty phase strategy, for failing to delve deeper into Bivins's background. *See, e.g., Burger v. Kemp,* 483 U.S. 776, 793–95, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) (holding that because counsel's strategy did not require a more thorough "investigation into [the defendant's] background in search of mitigating circumstances," counsel's assistance was not ineffective).

While Williams's counsel also offered some background evidence at his sentencing hearing, that evidence consisted only of brief testimony from Williams's mother and two neighbors that Williams was as a nice boy and not a violent person. (One of the neighbors had not been previously interviewed by defense counsel, but was noticed by counsel in the audience during the proceedings and asked to testify on the spot.) Counsel also played a taped excerpt from a statement by a psychiatrist that did little more than relate Williams[s] statement during an examination that in the course of one of his earlier robberies, he had removed the bullets from a gun so as not to injure anyone. *Williams,* 529 U.S. at ——, 120 S.Ct. at 1500.

In contrast to the *Williams* case, we concur with the post-conviction court that by presenting the information that counsel did on Bivins's background, character, and record as part of a reasonable strategy to try to persuade the jury and the court not to impose death, Bivins's trial counsel's penalty phase performance was not below the range expected of reasonable, professionally competent assistance of counsel.

Because Bivins's post-conviction court found no deficient performance, it did not address the prejudice prong of his claim. In contrast, the Virginia court that heard Williams's petition for post-conviction relief found that if his trial counsel's performance had measured up to the constitutionally required standard, there was a reasonable probability that the result would have been different. *Id.* at ——, 120 S.Ct. at 1501. This was also the view of the federal district court judge who heard Williams's petition for habeas corpus, *id.* at ——, 120 S.Ct. at 1502, and at least six members of the U.S. Supreme Court, *id.* at ——, ——, 120 S.Ct. at 1516, 1525. Justice Stevens identified the following evidence of "Williams'[s] nightmarish childhood" that the jury would have learned about had counsel's performance not been deficient:

(1) Williams's parents had been imprisoned for the criminal neglect of Williams and his siblings.

(2) Williams had been severely and repeatedly beaten by his father.

(3) Williams had been committed to the custody of the social services bureau for two years during his parents' incarceration (including one stint in an abusive foster home).

(4) After Williams's parents were released from prison, he was returned to their custody.

(5) Williams was "borderline mentally retarded" and did not advance beyond sixth grade in school.

*Id.* at ——, 120 S.Ct. at 1514. Justice O'Connor cited the same factors in reaching the same conclusion. *Id.* at ——–——, 120 S.Ct. at 1524–25.

The mitigation evidence presented at Bivins's post-conviction proceeding was far more modest. Unlike Williams's case, there was no evidence of physical abuse, no evidence of criminal neglect, and no evidence of mental retardation. As to educational attainment, the evidence was that Bivins completed the tenth grade and passed the GED test. To be sure, Bivins presented the post-conviction court with additional information about his background to that presented in the penalty phase—the strained relationship with his father, the hard-scrabble neighborhood, and his speech impediment and ADHD. To the extent that counsel's performance was deficient for failing to investigate and present these additional circumstances, we conclude that they added only detail and not weight to the mitigating evidence pre-

sented at trial. And each of these are such common circumstances that there is no reasonable probability that their having been presented to the jury or the sentencing judge would have changed their respective sentencing determinations.

As to Bivins's argument that counsel's performance was deficient for failing to investigate school, health, and service records, we again observe that Bivins himself acknowledges that these would not have been used as evidence of mitigation because of the offsetting negative information they contain. *Cf. Williams*, 529 U.S. at ————, 120 S.Ct. at 1514–15.

■■■ The mitigation evidence presented to the post-conviction court does not lead us to a conclusion contrary to that court's determination that Bivins was not the victim of deficient performance of counsel. Even if Bivins's counsel rendered deficient performance, we conclude that there is no reasonable probability that the result of the sentencing phase would have been different.

Bivins also makes a discrete claim that the post-conviction court erroneously held in conclusion of law no. 101 that trial counsel "provided competent assistance during the sentencing hearing before the judge." (R. at 598.) In support of this argument, Bivins cites *Averhart v. State*, 614 N.E.2d 924 (Ind.1993). In *Averhart*, we vacated a death sentence where counsel essentially abandoned his client both at the penalty phase before the jury and at judicial sentencing. *Id.* at 931. Here, as we have seen, this was not the case in the penalty phase. Further, after the penalty phase here, counsel commissioned a psychological evaluation of Bivins. At judicial sentencing, he presented the evaluation to the court; reminded the court of the mitigating evidence presented during the penalty phase; and asked the court to consider evidence of intoxication and Bivins's mental state at the time of the crime. Coun-

sel's performance at judicial sentencing does not lead us to a conclusion contrary to the post-conviction court's determination that trial counsel provided competent assistance during judicial sentencing.

## II

Bivins contends that he did not receive the effective assistance of counsel to which he was entitled when his trial counsel (a) failed to discover certain statements made by Bivins's accomplices, Ronald Chambers and Scott Weyls, and by Joni Chambers (Chambers's wife) to police, and (b) failed to impeach Chambers's and Weyls's testimony at trial in several important respects.[5]

## A

■■■ During the course of investigating the crimes of which Bivins was convicted, the Indiana State Police took statements from Chambers on February 6, 1991, Weyls on January 18, 1991, and Joni Chambers on August 5, 1991. Although Bivins's trial counsel had requested copies of any statements made by persons other than Bivins which were relevant to the proceedings, these statements were not disclosed. (The police had taken additional statements from these individuals at other times which were disclosed.) Bivins now argues that, had counsel conducted a reasonable pre-trial investigation into the backgrounds of Bivins's co-defendants, rather than relying solely upon the State to provide impeaching materials, they, like post-conviction counsel, could have easily discovered the existence of these statements. In response, the State argues that because trial counsel had requested all such statements as part of a continuing discovery request, their performance met the minimum necessary standards of performance. The State also argues that Bi-

---

5. Our opinion on direct appeal recounted that Chambers and Weyls were with Bivins throughout the evening in which the crimes

which are the subject of this proceeding were committed. *See Bivins*, 642 N.E.2d at 935.

vins was not prejudiced by the absence of these statements.

The post-conviction court made certain findings of fact from which it concluded that trial counsel's performance was not deficient for failing to discover the three pre-trial statements given by Chambers, Weyls, and Joni Chambers. (Concl. of law no. 88, R. at 590.) In particular, the post-conviction court held: "On April 15, 1991, [defense counsel] Gross served upon the prosecutor a motion to produce all statements made by any persons relevant to this case. Counsel is not required to do anything more." (*Id.*)

Our review of the record indicates that there was evidence to support the post-conviction court's findings of fact. In particular, the prosecutor had been served a motion to produce all such statements. And our review of the findings does not lead us to an opposite conclusion. While we are not prepared to say that in all circumstances, "[c]ounsel is not required to do anything more" than file a discovery request to comply with the Sixth Amendment, here we find the conclusion valid. The request was filed; the prosecutor had a clear legal obligation to comply with it (*see* part III, *infra*); the prosecutor did in fact supply other statements by these witnesses pursuant to the request; and in this appeal Bivins himself points to nothing that suggests that counsel should have suspected that its discovery request was not being complied with in full. We find that counsel's performance in failing to discover the three pre-trial statements was not deficient within the meaning of the first prong of the *Strickland* test and, as such, Bivins was not denied the effective assistance of counsel to which he was entitled. *See Rondon,* 711 N.E.2d at 518 (finding no ineffective assistance of counsel where counsel did not discover information beyond what the State had supplied, which included witnesses' statements, police reports, inventory reports, photographs, lab reports, arrest reports, and an autopsy report).

**B**

 Bivins also argues that he was denied the effective assistance of counsel to which he was entitled when his trial counsel failed to use the statements just discussed, other pre-trial statements by Chambers and Weyls, and the in-court testimony of Chambers and Weyls to impeach their testimony in several important respects.

Bivins begins this line of argument by contending that the State's theory was that he had gone on a crime spree with the intent of killing someone to see how it felt and that evidence of this theory came exclusively from Chambers and Weyls. Because Chambers and Weyls had accompanied Bivins on the crime spree, he contends that the State had an interest in showing him as the most culpable while portraying Chambers and Weyls as less involved and less culpable. This, Bivins reasons, would have helped the State by bolstering their credibility to the jury and to the court. As such, Bivins's argument continues, effective assistance of counsel demanded that the defense prove that both Chambers and Weyls were lying during their direct examination testimony. Bivins points to facts in the three undisclosed pre-trial statements and other statements to which defense counsel had access during trial, and inconsistencies between Chambers's and Weyls's out-of-court statements, all of which Bivins contends demonstrates a much greater degree of involvement in the crimes than their in-court testimony indicated. Yet, Bivins says, there was no such cross-examination along these lines. Br. of Appellant at 65–71.

Two examples suffice. Chambers and Weyls both testified that Weyls stayed in the car during the Dollar Inn robbery. Yet in a sworn statement taken from Chambers on October 2, 1991, and available to trial counsel at trial, Chambers told authorities that Weyls was in the hotel room at the Dollar Inn and that Weyls

may have hit one of the robbery victims. Second, Chambers testified initially that all three men went into the restroom at the rest park and then all three left the building and walked toward the car. Chambers said that he and Bivins then returned to the men's room and found Radcliffe washing his hands. But Weyls testified that he saw Chambers and Bivins approach Radcliffe and that each of them took a hold of Radcliffe and shoved him into the men's room. Bivins argues that defense counsel failed to impeach these State witnesses by failing to point out the contradictions in their testimony. Br. of Appellant at 67–68.

Bivins also makes a similar argument that it was in the State's interest that Chambers and Weyls be portrayed as extremely cooperative witnesses, again for the purpose of enhancing their credibility to the jury and the court. *Id.* at 68. As such, Bivins contends, effective assistance of counsel demanded that the defense demonstrate that Chambers and Weyls had not been cooperative and only agreed to give testimony favorable to the State's theory when it was to their benefit, *e.g.*, when certain charges against them were dropped. Bivins contends that the three undisclosed statements demonstrate that during previous meetings with authorities, Chambers and Weyls did not supply information concerning the murder and that Chambers had denied any involvement in the crimes from the time of his arrest until he gave his statement on October 2, 1991. *Id.*

The post-conviction court made certain findings of fact from which it concluded that the methods of cross-examination are a matter of trial strategy, and that trial counsel had competently cross-examined Chambers and Weyls:

> 93. Counsel competently cross-examined Bivins'[s] accomplices. "[T]he nature and extent of cross-examination is a matter of trial strategy, delegated to

trial counsel." *Osborne v. State*, 481 N.E.2d 376, 380 (Ind.1985). Counsel thoroughly questioned Chambers about whether he was telling the truth, about his prior convictions and periods of incarceration for burglary, theft, vehicle theft, and possession of stolen property, his parole status at the time of the instant offenses, about the fact that he was charged with murder for the instant offense but that charge was reduced to A felony robbery and four other charges were dismissed as part of a plea agreement with the prosecutor, about the fact that he believed he was testifying under a grant of immunity, about the fact that he had reached a plea agreement concerning his Tippecanoe County case for which he would receive no additional time, about his motivation for testifying, and about details of the charged offenses of January 16, 1991. Counsel questioned Weyls about his present incarceration for two counts of class A felony robbery and three class D felonies, and his prior convictions for theft, auto theft, robbery, second-degree murder and commission of a felony while armed with a deadly weapon ( [T.]R. at 3386–88). Through cross-examination, defense counsel also reminded the jury that Weyls was testifying under a grant of immunity ( [T.]R. at 3389). Counsel also questioned Weyls about the details and his role in the events of January 16, 1991 ( [T.]R. at 3389–3397). Such cross-examination tested the State's evidence and cannot be said to be unprofessional or to have deprived Bivins of a fair trial.

(R. at 593–94.)

Our review of the record indicates that there was evidence to support the post-conviction court's findings of fact. During cross-examination, trial counsel impeached Chambers's testimony, and thereby attacked his credibility, by presenting evidence of his prior convictions including theft, burglary and confinement.[6] Counsel

---

**6.** Trial counsel elicited testimony from Chambers revealing that the State initially charged

further attacked Chambers's credibility by impeaching his motivation for testifying against Bivins. In particular, Chambers was forced to testify that he had entered into a plea agreement in which the murder charge against him was reduced to a robbery charge and all other charges against him were dropped completely. Chambers's cross-examination also yielded the fact that Chambers was testifying against Bivins under the protection of use-immunity – that he was shielded from prosecution for any self-incriminating statements he made to implicate Bivins.[7]

In trial counsel's cross-examination of Weyls, counsel asked Weyls about his present incarceration for two counts of Class A felony robbery and three Class D felonies, and his prior convictions for theft, auto theft, robbery, second-degree murder, and commission of a felony while armed with a deadly weapon. Trial counsel informed the jury that, similar to Chambers's situation, Weyls was also testifying under a grant of immunity. Counsel further questioned Weyls about the details concerning his role in the events of January 16, 1991.

 Our review of the post-conviction court's findings does not lead us to an opposite conclusion than that trial counsel conducted competent cross-examinations of State witnesses, Chambers and Weyls. While there were inconsistencies between some of the out-of-court and in-court statements and between the in-court testimony of these two witnesses that might have been useful for impeachment purposes, counsel is permitted 'to make reasonable judgments in strategy. *See Olson v. State*, 563 N.E.2d 565, 568 (Ind.1990) and *Fugate v. State*, 608 N.E.2d 1370, 1373 (Ind.1993) (each holding that the method of impeaching witnesses was a tactical decision, a matter of trial strategy, and did

not amount to ineffective assistance of counsel). Here, trial counsel repeatedly placed the credibility of Chambers and Weyls into question. In opening argument, trial counsel vigorously raised its "the deal with the squeal" theme, emphasizing the fact that Chambers entered into favorable plea agreement and that both Chambers and Weyls were granted use-immunity. (T.R. at 2592–93.) As discussed *supra*, counsel repeatedly attacked the credibility of Chambers and Weyls using the plea agreements, the use-immunity arrangements, and their prior convictions. The post-conviction court's findings support its conclusion that counsel's cross-examination of Chambers and Weyls was not deficient within the meaning of the first prong of the *Strickland* test and, as such, Bivins was not denied the effective assistance of counsel to which he was entitled. *See, e.g., Harrison v. State*, 707 N.E.2d 767, 780 (Ind.1999) (ruling that where trial counsel challenged the credibility of two state witnesses in opening and closing statement, and further conducted a thorough cross-examination of these witnesses, counsel's failure to obtain impeaching evidence offered at post-conviction stage was not outside the range of acceptable counsel performance under *Strickland*), *cert. denied*, —— U.S. ——, 120 S.Ct. 1722, 146 L.Ed.2d 643 (2000); *Stanley v. State*, 479 N.E.2d 1315, 1317 (Ind. 1985) (holding that where trial counsel attacked the credibility of a State witness by eliciting information about the witness's alcohol consumption and prior acts of arson, counsel's performance was not deficient in failing to call a Defense witness for further impeachment).

### III

 Bivins contends that he is entitled to post-conviction relief because the

---

Chambers with two counts of child molestation and one count of rape, but then offered Chambers a plea bargain of eight years for confinement only.

7. Where a witness has been granted use-immunity, any evidence given by that witness in open court "may not be used in any criminal proceeding against that witness. . . ." Ind. Code § 35–37–3–3(a) (1988).

State violated its obligation to disclose material exculpatory evidence by failing to provide defense counsel prior to trial the statements of Chambers, Weyls, and Joni Chambers discussed in part II, *supra.* In preparation for post-conviction proceedings, Bivins obtained the three statements which he contends are exculpatory. He is, of course, correct that State has an affirmative duty to disclose evidence favorable to a criminal defendant. *See Kyles v. Whitley,* 514 U.S. 419, 432, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (citing *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)). The State does not defend and we express our strong disapproval over the failure to provide these documents to the defense. As both the United States Supreme Court and this Court have repeatedly said, the right of a criminal defendant to access information in the defendant's file is essential to the constitutional right of due process of law. *See Denney v. State,* 695 N.E.2d 90, 94 (Ind. 1998) (citing *Brady,* 373 U.S. at 87, 83 S.Ct. 1194); *Johnson v. State,* 693 N.E.2d 941, 946 (same), *reh'g denied; Games v. State,* 684 N.E.2d 466, 471–72 (Ind.1997) (same), *modified on other grounds,* 690 N.E.2d 211 (Ind.1997); *Bellmore v. State,* 602 N.E.2d 111, 119 (Ind.1992) (same).

██ However, a violation of the State's pre-trial obligation to disclose these documents is not enough, in itself, entitle a petitioner post-conviction relief. That requires a demonstration that the undisclosed favorable evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence" in the trial court's judgment. *Kyles,* 514 U.S. at 435, 115 S.Ct. 1555.

██ Bivins argues that this is the case here, using the same reasoning which we analyzed in the preceding section. That is, Bivins contends that the documents would have undermined the credibility of the State's two witnesses, Chambers and

Weyls, both as to their degree of involvement in the crimes and their degree of cooperation with the authorities in solving the crimes.

We begin our analysis by describing the three statements at issue.

On February 6, 1991, shortly after the Radcliffe killing, Chambers gave a statement to Officers Reed and Butler regarding an automobile accident that occurred on December 24, 1990. In the statement, Chambers explained that the truck driven by him belonged to Bivins, whom he had met while they were incarcerated together. Chambers also denied being acquainted with Weyls. At the post-conviction hearing, trial counsel testified that this statement was not "very important other than to show that Ron Chambers knew Jerry Bivins," an issue not disputed at trial. (R. at 1,658, 1,780–81.)

On January 18, 1991, two days after the Radcliffe killing, Scott Weyls gave a statement to Officer Butler following Weyls's arrest for public intoxication. Officer Butler questioned Weyls regarding a liquor store robbery that had occurred in the town of Rossville, Indiana. Weyls denied having committed any armed robberies since August 1990. When questioned about whether he was acquainted with Bivins, Weyls admitted that he knew Bivins from their days of incarceration, and that he had seen Bivins recently. Officer Butler informed Weyls that he (Weyls) was a suspect in the robberies and the Radcliffe killing. Weyls denied having any knowledge regarding the Radcliffe killing other than what he heard in the news media.[8] At a post-conviction hearing, trial counsel agreed that Weyls's January 18, 1991, statement could have been used to contradict Weyls's in-court testimony. Counsel testified that even though Officer Butler "specifically asked about the murder at the rest park, [Weyls] gave no information for

---

8. At the post-conviction hearing, Weyls explained that he had always denied any involvement in the crimes, and that he and

Chambers met the day after the murder to agree to "keep their mouths shut." (R. at 1766.)

[the murder] at that particular time." (R. at 1782–92.)

Officer Butler also took a statement from Joni Chambers, Chambers's wife, on August 5, 1991. In that statement, Joni Chambers told police about Chambers's account of the robberies at the Dollar Inn, the Holiday Inn, and the rest park. Joni reported that Chambers told her that he, Weyls, and Bivins participated in the robberies. Joni also stated that according to Chambers, Bivins shot Radcliffe in the back of the head. Joni reported that when Chambers asked Bivins why he had shot Radcliffe, Bivins responded that he just wanted to know what it felt like to kill somebody. She also told the officer about other robberies committed by Bivins. Officer Butler, who worked in Tippecanoe County, did not give the statement to the Boone County prosecutor.

The post-conviction court made certain findings of fact from which it concluded that no *Brady* violation occurred:

65. The claim concerning non-disclosure of Chambers, February 6, 1991 statement lacks merit because that statement concerned an automobile accident, not the crime spree for which Bivins was convicted. As Gross indicated, this statement would not be of much use, other than to prove Chambers knew Bivins, a fact not disputed at trial. Any impeachment value in the portion of the statement where Chambers denies knowing Weyls would have been slight because whether Chambers knew Weyls was not a disputed issue at trial and could have easily been explained as the attempt of accomplices to keep quiet about their offenses until implicated. Counsel thoroughly cross-examined Chambers about other matters and impeached him with evidence of prior convictions and his plea agreements. Moreover, in light of Bivins'[s] confessions and other evidence implicating him, there is no reasonable probability of a different result if the statement had been provided to counsel. *See House[ v.*

*State]*, 535 N.E.2d [103, 107 (Ind.1989), *reh'g denied.*]

66. Nor is there any reasonable probability of a different result had Scott Weyls'[s] January 18, 1991[,] statement to Officer Butler been provided to counsel. Even without the statement, counsel was able to impeach Weyls with evidence of other convictions. Though the undisclosed statement was inconsistent with Weyls'[s] trial testimony about events on the night of the murder in that he denies knowledge of the crimes in the statement, the inconsistency could have been easily explained at trial as the predictable attempt of accomplices to keep quiet about his offenses until implicated. Gross admitted that before trial he had reviewed transcripts of telephone conversations, conversations between Bivins and Weyls before trial, in which Weyls had not implicated Bivins in the crimes. Thus, counsel could have used these conversation, if he had wished, to suggest Weyls had given statements inconsistent with his trial testimony. The prosecutor was not attempting to hide Weyls'[s] earlier version of events. Moreover, Chambers also testified about Bivins committing the theft at the Lazarus store in Lafayette, committing the robbery at the Holiday Inn and robbing and shooting Mr. Radcliffe at the rest park ([T.]R. at 3666–83). Most significantly, Bivins himself confessed to police that he shot Mr. Radcliffe and provided details about the murder weapon and its location. *Bivins*, 642 N.E.2d at 937. Accordingly, there is no reasonable probability of a different result if Weyls had been impeached with his pretrial statement. *See House*, 535 N.E.2d at 107. The non-disclosure of this statement did not undermine the reliability of the verdict or sentence.

(R. at 574–75.)

 Our review of the post-conviction court's findings does not lead us to an opposite conclusion than that no *Brady* violation occurred. The prosecution's sup-

pression of favorable evidence upon the defendant's request of evidence "violates due process where the evidence is material either to guilt or to punishment." *Brady,* 373 U.S. at 87, 83 S.Ct. 1194. The United States Supreme Court in *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), determined that material impeachment evidence as well as exculpatory evidence fall within the *Brady* rule. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 682, 105 S.Ct. 3375; *Kyles,* 514 U.S. at 433–34, 115 S.Ct. 1555; *Williams v. State,* 724 N.E.2d 1070, 1083 (Ind.2000). A " 'reasonable probability' of a different result" is demonstrated "when the government's evidentiary suppression 'undermines confidence in the outcome of the of the trial.' " *Kyles,* 514 U.S. at 434, 115 S.Ct. 1555 (quoting *Bagley,* 483 U.S. at 678, 107 S.Ct. 3054); *Williams,* 724 N.E.2d at 1083. If we find that a "reasonable probability" exists, then the favorable evidence is material under *Brady,* and its suppression from the prosecution results in constitutional error thereby warranting a new trial. *See Kyles,* 514 U.S. at 434–36, 115 S.Ct. 1555.

We are not led to a finding opposite the post-conviction court's that there was no reasonable probability that had the undisclosed statements of Chambers and Weyls been available to trial counsel, the outcome of Bivins's trial would have been different.

As to Chambers's statement given to authorities on February 6, 1991, this statement concerned an automobile accident which had occurred almost a few months earlier. The State's failure to discover this statement did not prejudice Bivins as trial counsel testified that he would have used it merely to show that Chambers knew Bivins—an uncontested fact at trial. While Chambers did not voluntarily disclose his involvement in the Radcliffe killing, our review of the record indicates that the authorities never questioned Chambers about such information at the time. Although trial counsel could have used this statement to impeach Chambers on the basis that Chambers first denied having known Weyls, counsel employed another method of impeachment by questioning Chambers about his plea agreements, use-immunity arrangements, and prior convictions. *See* part II–B, *supra.*

Weyls's statement, in which he had explicitly denied that he was Bivins's accomplice, could have been used to impeach Weyls on cross-examination. But, as discussed in part II–B *supra,* trial counsel effectively impeached Weyls by attacking his plea agreement, use-immunity arrangements, and prior convictions.

Although Joni Chambers's August 5, 1991, statement was introduced at the post-conviction hearing, Bivins failed to advance any argument concerning it in his petition for post-conviction relief. Accordingly, the argument is not available for review here. *See Roche,* 690 N.E.2d at 1122–23 (holding that claims not presented until appellant's brief in an appeal from denial of post-conviction relief are waived) (citing *Canaan,* 683 N.E.2d at 235).

Furthermore, no information contained in either Chambers's or Weyls's statement in any way relieved Bivins of any guilt, portrayed Bivins as having less culpability, or was in any other way exculpatory. And the State presented overwhelming proof that Bivins killed Radcliffe: Bivins voluntarily confessed to committing the murder, *see Bivins,* 642 N.E.2d at 941; and Bivins directed the police to the location of the murder weapon, *see id.* Thus, in evaluating the significance of the undisclosed statements, the State's case would not have been significantly impaired had they been available to trial counsel. Because we find that the undisclosed favorable evidence did not put the "whole case in such a different light as to undermine confidence" in the trial court's judgment, we affirm the post-conviction court's conclusion that no *Brady* violation occurred. *See Games,* 684 N.E.2d at 471–72 (holding that the State's

failure to give the defendant impeachment evidence did not undermine the confidence in the trial's outcome where trial counsel employed other methods to impeach a State witness and the evidence against the defendant was overwhelming).

## IV

Bivins contends that he was denied the fair trial to which he was entitled when fliers with negative information about him were posted in and around the courthouse during trial. The fliers were printed on 8½″ × 11″ paper and contained comments concerning the expense of Bivins's clothing which had been purchased at county expense.

This issue was available to Bivins on direct appeal and so may not be litigated here. A post-conviction relief proceeding is not available for issues which could have been raised earlier. *See Weatherford v. State,* 619 N.E.2d 915, 917 (Ind.1993), *reh'g denied.*

Furthermore, the trial court made certain findings of fact to the effect that there was no evidence showing that any of Bivins's jurors saw the fliers. (*See* Finding of fact no. 17.) We find nothing in the record in conflict with this finding. Indeed, Bivins does not contend that any juror saw or was otherwise made aware of the fliers. *See* Br. of Appellant at 81–85. In the absence of any suggestion that any juror saw or was otherwise made aware of the fliers, we conclude that the fliers in no way adversely affected Bivins's right to a fair trial.

## V

Bivins raises several challenges to the constitutionality of the Indiana death penalty statute. In his direct appeal of his convictions and death sentence, he raised multiple challenges to the constitutionality of the statute which we analyzed at length. *See Bivins,* 642 N.E.2d at 945–49. We hold that Bivins has sufficiently litigated the constitutionality of the statute.

*Conclusion*

We affirm the post-conviction court's denial of Bivins's petition for post-conviction relief.

SHEPARD, C.J., and DICKSON, BOEHM, and RUCKER, JJ., concur.