**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**GARY L. GRINER**
Griner & Company
Mishawaka, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ANDREW FALK**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JAMES BROCK RODGERS, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 71A05-1302-CR-73 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE ST. JOSEPH SUPERIOR COURT
The Honorable Jerome Frese, Judge
Cause No. 71D03-1205-FD-437

**June 10, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BRADFORD, Judge**

On the evening of May 10, 2012, Appellant-Defendant James Rodgers, Charles Chapman, and Cheyenne Milbourn went to an apartment building owned by James Eller and took the refrigerators out of two vacant apartments. Rodgers, Chapman, and Milbourn planned to sell the refrigerators as scrap and to split the money received from the sale of the refrigerators. Eller had not given Rodgers, Chapman, or Milbourn permission to take the refrigerators.

Rodgers was subsequently charged with and convicted of one count of Class D felony theft. On appeal, Rodgers challenges his conviction by claiming that the evidence is insufficient to sustain his conviction. Rodgers also claims that his conviction should be reversed because the deputy prosecutor committed prosecutorial misconduct. Concluding that the evidence is sufficient to sustain Rodger's convictions and that any potential misconduct by the deputy prosecutor was cured by the trial court's final instructions to the jury, we affirm.

## FACTS AND PROCEDURAL HISTORY

On May 10, 2012, Chapman was staying with Rodgers at Rodgers's residence. Rodgers's girlfriend, Milbourn, also lived in the residence. Neither Chapman nor Rodgers had a job, and money was tight. At some point, Chapman, Rodgers, and Milbourn decided that they would take refrigerators out of vacant apartments in an apartment building where Chapman had previously resided with his step-mother. Chapman, Rodgers, and Milbourn planned to "[g]o in, take [the refrigerators], and leave and take [the refrigerators] to the scrap yard." Tr. p. 77. Chapman, Rodgers, and Milbourn planned to "split the money [received for

2

the refrigerators] up three ways." Tr. p. 78.

Milbourn drove herself, Chapman, and Rodgers to the apartment building in a dark green Ford Explorer. Once they arrived at the building, Chapman and Rodgers went into a vacant upstairs apartment and took the refrigerator. They carried it downstairs and loaded it in the Ford Explorer. The three then returned to Rodgers's residence where Chapman and Rodgers unloaded the refrigerator. The three then returned to the apartment building for another refrigerator. Upon arriving at the apartment building for the second time, Chapman and Rodgers went into a vacant downstairs apartment, took the refrigerator, and loaded it into the Ford Explorer. They then returned, for a second time, to Rodgers's residence.

Samuel Arreguin, who lived next to the apartment building, notified police after he heard noises coming from the apartment building and saw individuals taking a refrigerator. Corporal Glen Roach was dispatched to the apartment building. When Corporal Roach arrived at the apartment building, Arreguin told him that he had seen a female sitting in the driver's seat of a dark-colored Ford Explorer. The Ford Explorer was backed into the driveway. Two men, one of whom Arreguin recognized as Chapman, were loading a refrigerator into the Ford Explorer.

Corporal Roach looked through the window of the vacant downstairs apartment and could see markings on the floor indicating where the refrigerator had been. Corporal Roach then went to the upstairs apartment where he found "an empty space where a refrigerator had once been and all the contents from that refrigerator [were] now on top of the stove which was right next to it." Tr. pp. 32-33. Arreguin informed Corporal Roach that Chapman had

3

moved to a residence "somewhere on Mishawaka Avenue" "by the bait shop." Tr. p. 33. Corporal Roach sent out a city-wide description of the dark-colored Ford Explorer used in the theft of the refrigerators.

Meanwhile, Sergeant Wesley Thompson was on patrol on Mishawaka Avenue when he saw a dark green Ford Explorer that matched the description of the vehicle used in the theft of the refrigerators. Sergeant Thompson noticed a large item, possibly a refrigerator, in the back of the Ford Explorer. Sergeant Thompson approached the vehicle, looked inside, and saw that the large item was in fact a refrigerator. Sergeant Thompson advised dispatch of what he had seen. Other officers, including Corporal Roach, soon arrived at the scene.

Upon returning to his residence, Rodgers "took a jigsaw and cut the back of the copper pieces off" the first refrigerator. Tr. p. 80. Rodgers and Chapman were preparing to unload the second refrigerator from the Ford Explorer when Sergeant Thompson "pulled up." Tr. p. 78. Rodgers took off running when he saw Sergeant Thompson. Upon arriving at the scene, Corporal Roach found that one refrigerator was still in the Ford Explorer. The second refrigerator was "down the east side of the building." Tr. p. 33. Corporal Roach noticed that the doors and the coils on the back had been removed from the second refrigerator. Corporal Roach also noticed that the freezer of the second refrigerator still had frost and ice in it.

Chapman admitted his involvement in the theft shortly after he was taken into custody. Chapman also told the investigating officer about Rodgers's and Milbourn's involvement. Initially, Chapman claimed that it was Rodgers's idea to steal the refrigerators but subsequently admitted "that it was all of us … it wasn't just him." Tr. p. 90.

4

On May 11, 2012, the State charged Rodgers with one count of Class D felony theft.[1]

A jury trial was held on November 26 and 27, 2012, after which the jury found Rodgers

guilty as charged. On February 5, 2013, the trial court sentenced Rodgers to "two years

incarceration" with "[o]ne year suspended." Appellant's App. p. 39. This appeal follows.

## DISCUSSION AND DECISION

### I. Sufficiency of the Evidence

Rodgers contends that the evidence is insufficient to sustain his conviction for Class D

felony theft.

> When reviewing the sufficiency of the evidence to support a conviction,
> appellate courts must consider only the probative evidence and reasonable
> inferences supporting the verdict. It is the fact-finder's role, not that of
> appellate courts, to assess witness credibility and weigh the evidence to
> determine whether it is sufficient to support a conviction. To preserve this
> structure, when appellate courts are confronted with conflicting evidence, they
> must consider it most favorably to the trial court's ruling. Appellate courts
> affirm the conviction unless no reasonable fact-finder could find the elements
> of the crime proven beyond a reasonable doubt. It is therefore not necessary
> that the evidence overcome every reasonable hypothesis of innocence. The
> evidence is sufficient if an inference may reasonably be drawn from it to
> support the verdict.

*Drane v. State*, 867 N.E.2d 144, 146-47 (Ind. 2007) (citations, emphasis, and quotations

omitted). "In essence, we assess only whether the verdict *could* be reached based on

reasonable inferences that may be drawn from the evidence presented." *Baker v. State*, 968

N.E.2d 227, 229 (Ind. 2012). Upon review, appellate courts do not reweigh the evidence or

---

[1] Ind. Code § 35-43-4-2.

5

assess the credibility of the witnesses. *Stewart v. State*, 768 N.E.2d 433, 435 (Ind. 2002). Inconsistencies in witness testimony go to the weight and credibility of the testimony, "the resolution of which is within the province of the trier of fact." *Jordan v. State*, 656 N.E.2d 816, 818 (Ind. 1995).

Indiana Code section 35-43-4-2 provides, in relevant part, that a "person who knowingly or intentionally exerts unauthorized control over [the] property of another person, with [the] intent to deprive the other person of any part of its value or use, commits theft, a Class D felony." "A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so." Ind. Code § 35-41-2-2(b). "A person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so." Ind. Code § 35-41-2-2(a).

In challenging his conviction, Rodgers claims that the evidence is insufficient to sustain his conviction because the State's sole evidence against Rodgers was Chapman's testimony. Rodgers asserts that Chapman's testimony should not have been believed by the jury because Chapman, who was caught "red-handed by the police," "made up the story about Rodgers'[s] involvement" and testified against Rodgers in exchange for a "significantly reduced sentence." Appellant's Br. p. 6. However, despite Rodgers's claim that Chapman's testimony should not have been believed, it is well-settled that in a criminal proceeding, "'[t]he jury is free to believe whomever they wish.'" *McClendon v. State*, 671 N.E.2d 486, 488 (Ind. Ct. App. 1996) (quoting *Michael v. State*, 449 N.E.2d 1094, 1096 (Ind. 1983)); *see also Kocher v. State*, 439 N.E.2d 1344 (Ind. 1982) (providing that when the

6

evidence is in conflict, the jury is free to believe whomever they wish); *Hammond v. State*, 594 N.E.2d 509, 515 (Ind. Ct. App. 1992) (providing that the trial court was not obligated to believe Hammond's testimony), *trans. denied*. The jury considered Chapman's testimony and apparently found it to be credible.

The evidence most favorable to the jury's verdict demonstrates that Rodgers knowingly or intentionally exerted unauthorized control of two refrigerators belonging to Eller. Milbourn drove herself, Chapman, and Rodgers to the apartment complex and waited in the vehicle while Chapman and Rodgers went into a vacant apartment, took the refrigerator, and loaded the refrigerator into the Ford Explorer. Milbourn drove the vehicle back to Rodgers's apartment where Chapman and Rodgers unloaded the refrigerator. The three repeated the process and took a second refrigerator from a second vacant apartment. Chapman testified that the three intended to sell the refrigerators as scrap and to "split the money up three ways." Tr. p. 78.

Furthermore, while Arreguin did not identify Rodgers as one of the individuals who participated in the theft of the refrigerators, he told Corporal Roach that he saw a female waiting in the driver's seat while Chapman and another man loaded a refrigerator into the Ford Explorer. This statement corroborated Chapman's testimony that Milbourn waited in the Ford Explorer while he and Rodgers loaded the refrigerators into the vehicle. The evidence presented at trial is sufficient to sustain Rodgers's conviction for Class D felony theft. Rodgers's claim to the contrary amounts to an invitation to reweigh the evidence, which we will not do. *Stewart*, 768 N.E.2d 433 at 435.

7

## II. Prosecutorial Misconduct

Rodgers also contends that his conviction should be reversed because the deputy prosecutor committed prosecutorial misconduct.

> When reviewing a claim of prosecutorial misconduct, we must first consider whether the prosecutor engaged in misconduct. *Williams v. State*, 724 N.E.2d 1070, 1080 (Ind. 2000). We must then consider whether the alleged misconduct placed [Rodgers] in a position of grave peril to which he should not have been subjected. *Id.* In judging the propriety of the prosecutor's remarks, we consider the statement in the context of the argument as [a] whole. *Hollowell v. State*, 707 N.E.2d 1014, 1024 (Ind. Ct. App. 1999).…
> When an improper argument is alleged to have been made, the correct procedure is to request the trial court to admonish the jury. *Dumas v. State*, 803 N.E.2d 1113, 1117 (Ind. 2004). If the party is not satisfied with the admonishment, then he or she should move for mistrial. *Id.* Failure to request an admonishment or to move for mistrial results in waiver. *Id.* Where a claim of prosecutorial misconduct has not been properly preserved, our standard of review is different from that of a properly preserved claim. More specifically, the defendant must establish not only the grounds for the misconduct but also the additional grounds for fundamental error. *Booher v. State*, 773 N.E.2d 814, 817 (Ind. 2002). Fundamental error is an extremely narrow exception that allows a defendant to avoid waiver of an issue. It is error that makes "a fair trial impossible or constitute[s] clearly blatant violations of basic and elementary principles of due process ... present[ing] an undeniable and substantial potential for harm." *Benson v. State*, 762 N.E.2d 748, 756 (Ind. 2002).

*Hand v. State*, 863 N.E.2d 386, 393-94 (Ind. Ct. App. 2007).

Rodgers argues that the deputy prosecutor committed prosecutorial misconduct by making a comment during closing argument that Rodgers claims alluded to his failure to testify at trial. Rodgers, however, neither requested an admonishment nor moved for a mistrial when the deputy prosecutor made the challenged comment. Therefore, Rodgers has waived his claim of prosecutorial misconduct and, as a result, must show that any misconduct

resulted in fundamental error to succeed on appeal. *See id.* at 394.

> In determining whether a prosecutor's comments are error, fundamental or otherwise, we look to see if the comments in their totality are addressed to the evidence rather than the defendant's failure to testify. If so, there are no grounds for reversal. *Hopkins v. State*, 582 N.E.2d 345, 348 (Ind. 1991); *Hill v. State*, 517 N.E.2d 784, 788 (Ind. 1988). Arguments that focus on the uncontradicted nature of the State's case do not violate the defendant's right to remain silent. [*Isaacs v. State*, 673 N.E.2d 757, 764 (Ind. 1996)].

*Carter v. State*, 686 N.E.2d 1254, 1262 (Ind. 1997).

In arguing that the deputy prosecutor committed prosecutorial misconduct, Rodgers claims that the deputy prosecutor made a comment during closing argument which violated his Fifth Amendment privilege against self-incrimination because the comment invited the jury to make a negative inference from the fact that Rodgers did not testify at trial.

> The Fifth Amendment privilege against self-incrimination is violated "when a prosecutor makes a statement that is subject to reasonable interpretation by a jury as an invitation to draw an adverse inference from a defendant's silence." *Moore v. State*, 669 N.E.2d 733, 739 (Ind. 1996). However, statements by the prosecutor concerning the uncontradicted nature of the State's evidence do not violate the defendant's Fifth Amendment rights. *Martinez v. State*, 549 N.E.2d 1026, 1028 (Ind. 1990). Rather, comment on the lack of defense evidence is proper so long as the State focuses on the absence of any evidence to contradict the State's evidence and not on the accused's failure to testify. *Id*.; *see also Timberlake v. State*, 690 N.E.2d 243, 254 (Ind. 1997) (observing "[d]uring argument, the prosecutor may argue and comment upon the evidence presented at trial.... A comment based upon uncontradicted evidence is not equivalent to an impermissible comment upon a defendant's decision not to testify").

*Dumas*, 803 N.E.2d at 1118. A defendant challenging a remark made by the prosecution has the burden of proving that the remark penalized his exercise of the right to remain silent. *Moore*, 669 N.E.2d at 736.

9

Upon review, a court must also assess the effectiveness of any corrective measures taken by the trial judge. *Id*. at 741.

> In *Blume* [*v. State*], 154 Ind. 343, 56 N.E. 771 [(1900)], we applied a kind of harmless error rule to uphold a conviction despite a comment that was improper under Indiana's former no-comment statute. We reasoned that
>> [i]t must be presumed that the jury are [people] of sense, and that they will obey the admonition of the court when told that they must not permit the reference to the failure of the defendant to testify, to influence their minds.... We do not think that [an improper comment] should, in all cases, have the extreme effect of arresting the cause, and compelling the court to grant a new trial, where reasonable and prompt measures are taken by the court to prevent any injurious effect from such unprofessional and indefensible conduct.
>
> *Id.* at 356, 56 N.E. at 776; *see also* [*Bernard v. State*, 540 N.E.2d 23, 25 (Ind. 1989)]; [*Lee v. State*, 531 N.E.2d 1165, 1168 (Ind. 1988)]. Where a curative instruction effectively defused the impact of a prosecutor's improper remark, we have refused to reverse. *See, e.g.*, *Parsons v. State*, 472 N.E.2d 915 (Ind. 1985).

*Id*. (First two and last two sets of brackets supplied, others in original). Further, even if a prosecutor makes an improper comment on a defendant's silence, such comment can be found to be harmless if the State demonstrates "beyond a reasonable doubt that the remark—with its rhetorical impact weighed against the closeness of the case and discounted by the corrective effect of judicial action—did not alter the jury's verdict." *Id*.

In *Moore*, in response to the defendant's criticism that the State's evidence was imprecise, the prosecutor remarked:

> when you look at the defendant's case and he chose to put on a case in this, *he didn't choose to testify which is his right, and he certainly doesn't, isn't compelled to testify* but he did choose to put on witnesses, that by examination of all the evidence, the more precise case which is [the State's] is not a matter of science but beyond a reasonable doubt.

10

*Id*. at 735. "Defense counsel moved for a mistrial, but the [trial] court denied the motion."

*Id*. Instead, the trial court instructed the jurors to disregard the remark and polled the jury about whether they would be able to do so. *Id*. Upon review, the Indiana Supreme Court determined that the persuasive caliber of the prosecutor's remark was minimal and appeared to be isolated, inadvertent, and muddled; the State's case against the defendant was fairly strong; and the trial judge took action to mitigate any potential prejudice, including instructing the jury that they were not to consider the prosecutor's comment. *Id*. at 741. As such, the Court rejected the defendant's request that his conviction be overturned, concluding that any error in the prosecutor's statement was harmless. *Id*. at 742.

In the instant matter, defense counsel told a story during closing argument about a young boy who, fearing he would be punished after eating an entire pie that was meant for his whole family to enjoy, blamed the family dog for eating the pie. At the conclusion of this story, defense counsel stated, "Don't let Chapman do that in this case. Give [Rodgers] the benefit of the doubt that he's entitled to under the law. Don't convict him of a felony." Tr. p. 111. After defense counsel finished his closing argument, the deputy prosecutor started his closing argument by saying, "Here's the problem with that story. The dog can't talk. That's the problem with the story. No one framed James Rodgers. The story doesn't have any relevance in this case because the dog can't talk." Tr. pp. 111-12. The deputy prosecutor then shifted the focus of his closing argument to the evidence presented at trial which the State claimed demonstrated Rodgers's guilt beyond a reasonable doubt.

Shortly after the parties finished their closing arguments, the trial court gave the jury

11

its final instructions. These instructions included the following:

> When the evidence was completed, the attorneys made final arguments. These final arguments are not evidence but were given to help you evaluate the evidence. In final arguments, attorneys are permitted to characterize the evidence, to argue the law, and to try to persuade you to a particular verdict. You may accept or reject those arguments as you see fit.
> ****
> Under the law, you must presume that the defendant is innocent and must continue to do so throughout the trial.
> Because he is presumed to be innocent, the defendant is not required to prove his innocence, to present any evidence, or to prove or explain anything. The burden of proof is on the State alone and never shifts to the accused. While every person charged with the commission of a crime is presumed to be innocent, if after deliberating you find that the evidence has proven the charge beyond a reasonable doubt, that presumption of innocence is overcome.
> ****
> By law, the person charged with the commission of a crime cannot be forced to testify and is under no obligation to testify. The fact that the defendant did not testify in this trial raises no presumption of any kind against him. You must not speculate upon his reasons for not testifying. You must not comment upon, refer to, or in any manner consider this fact in reaching your verdict.

Tr. pp. 119-123.

Assuming, without deciding, that the deputy prosecutor's comment was erroneous, we conclude that Rodgers's claim of prosecutorial misconduct must fail. Again, Rodgers did not object to the deputy prosecutor's comment or request an admonition or a mistrial at trial. Rodgers must therefore demonstrate that the deputy prosecutor's comment amounted to fundamental error, *see Hand*, 863 N.E.2d at 394, which he cannot do.

After making the allegedly erroneous statement, the deputy prosecutor shifted the focus of his closing argument to highlight the evidence presented at trial which the State argues was sufficient to prove Rodgers's guilt beyond a reasonable doubt. After the deputy

12

prosecutor completed his closing argument, the trial court instructed the jury that it must not speculate upon the reasons why Rodgers did not testify or consider Rodgers's failure to testify in reaching its verdict. The trial court further instructed the jury that a person charged with a crime is under no obligation to testify, and Rodgers's decision not to testify raised no presumption "of any kind" against him. Tr. p. 123.

Like the Indiana Supreme Court in *Moore* and *Blume*, we presume that the jury was made up of persons of sense who would obey the admonition of the trial court when told that they must not permit the reference to Rodgers's failure to testify to influence their minds. *See Moore*, 669 N.E.2d at 741 (citing *Blume*, 154 Ind. at 356, 56 N.E. at 776). The trial court's instructions to the jury were of a curative nature and effectively defused the impact of the deputy prosecutor's potentially erroneous statement to the jury. As such, in light of the trial court's curative instructions to the jury coupled with the fact that the deputy prosecutor did not dwell on the comments but rather quickly shifted the focus of his argument to the evidence presented at trial, we conclude that Rodgers had failed to prove that any error committed by the deputy prosecutor did not rise to the level of fundamental error. Accordingly, Rodgers has failed to establish that he suffered prosecutorial misconduct such to warrant the reversal of his conviction.

In sum, having concluded that the evidence is sufficient to sustain Rodgers's conviction for Class D felony theft, and that Rodgers has failed to establish that any error associated with the comment made by the deputy prosecutor during closing argument amounted to fundamental error, we affirm the judgment of the trial court.

The judgment of the trial court is affirmed.

RILEY, J., and BROWN, J., concur.